IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

AIR & LIQUID SYSTEMS CORPORATION, et al.,
                              Plaintiffs,

                                          Civil Action
          vs                              No. 11-247

ALLIANZ UNDERWRITERS INSURANCE COMPANY,
et al.,

                    Defendants.

_____


          Transcript of proceedings held on Wednesday,
November 16th, 2011, United States District Court, Pittsburgh,
Pennsylvania, before the Honorable Joy Flowers Conti, U.S.
District Court Judge.


APPEARANCES:

| | |
|---|---|
| Sally A. Clements | Ace Insurance S.A. N.V. |
| | HDI-Gerling Industrie |
| |   Versicherung AG |
| | Portman Insurance Limited |
| | QBE Insurance Limited |
| | Swiss Re Europe S.A. |
| | |
| Thomas E. Birsic | Air & Liquid Systems Corporation |
| David F. McGonigle | AMPCO-Pittsburgh Corporation |
| J. Nicholas Ranjan | |
| | |
| Susan S. Brown | Allianz Underwriters Insurance |
| Michael Butler | The American Insurance Company |
| | |
| Stefano Calogero | Allstate Insurance Company |
| | |
| Michael A. Shiner | Assicurazioni Generali S.P.A. |
| | Certain Underwriters at Lloyd's |
| |   London |
| | Equitas Insurance Limited |
| | Harper Versicherungs AG |
| | Sompo Japan Insurance Inc |

APPEARANCES (Contd.)

| | |
|---|---|
| Michael A. Shiner | Stronghold Insurance Company<br>Tenecom Limited<br>The Dominion Insurance Company |
| William James Rogers<br>Robert P. Siegel | Associated International<br>    Insurance Company |
| Robert B. Stein<br>Patrick Hofer | Columbia Casualty Company |
| William P. Shelley | Executive Risk Indemnity Inc.<br>Federal Insurance Company<br>Munich Reinsurance America, Inc. |
| Joseph P. Donley<br>Teresa L. Snider | Faraday Reinsurance Company<br>General Star International<br>    Indemnity Limited |
| Keith E. Whitson | First State Insurance Company<br>Twin City Fire Insurance Company |
| William F. Greaney<br>Timothy D. Greszler<br>William Geiger | Howden North American, Inc. |
| Kristan M. Cassidy<br>Dara DeCourcy | Lexington Insurance Company<br>New Hampshire Insurance Company |
| Amy R. Paulus | Old Republic Insurance Company |
| Lawrence A. Nathanson | TIG Insurance Company<br>United States Fire Insurance |

| | |
|---|---|
| Court Reporter: | Shirley Ann Hall, RDR, CRR<br>6260 U.S. Courthouse<br>Pittsburgh, PA 15219<br>(412) 765-0408 |

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

1                        P R O C E E D I N G S

2                              * * * * *

3              (In open court.)

4              THE COURT:  Good morning; please be seated.

5              This is a case management conference in the civil

6    action Air & Liquid Systems Corporation versus Allianz

7    Underwriters Insurance Company at Civil Action No. 11-247.

8              And it's also the time for a hearing on various

9    motions that have been filed by certain additional Defendants

10   in the 11-247 case, as well as some parallel motions that have

11   been filed in the case of Howden Buffalo, Inc., versus

12   HDI-Gerling Industrie at 09-1014.

13             So at this stage I'm going to — because there's so

14   many counsel, just to be careful, if you could just go through

15   and enter your appearance for the record.

16             MR. GREANEY:  Good morning, Your Honor.

17             William Greaney, counsel for Howden North America,

18   Inc.  With me is Tim Greszler of my firm.

19             MS. CLEMENTS:  Good morning, Your Honor.

20             Sally Clements for Ace European Group, QBE, Swiss

21   Re, Portman Insurance, and HDI-Gerling.

22             MS. CASSIDY:  Good morning, Your Honor.

23             Kristan Cassidy on behalf of Lexington Insurance

24   Company and the movant, New Hampshire Insurance Company.

25             MR. BIRSIC:  Your Honor, Tom Bursic, David McGonigle

1  and Nicholas Ranjan all from K&L Gates representing Air &

2  Liquid Systems Corporation.

3          MR. CALOGERO:  Stefano Calogero of Windels Marx

4  representing Allstate Insurance Company.

5          MR. SHELLEY:  William Shelley from Cozen & O'Connor

6  for Executive Risk Indemnity, Inc., and Federal Insurance

7  Company.

8          MR. DONLEY:  Joe Donley, Your Honor, for Faraday

9  Reinsurance Company and General Star; and with me is

10  Teresa Snider from Butler Rubin.  She has been admitted pro

11  hac vice, Your Honor.

12          THE COURT:  Thank you.

13          MR. WHITSON:  Keith Whitson, First State Insurance

14  Company.  Good morning, Your Honor.

15          MR. NATHANSON:  Good morning, Your Honor.

16          Larry Nathanson from Siegal & Park.  I represent US

17  Fire and TIG Insurance Company.

18          MS. BROWN:  Good morning, Your Honor.

19          Susan Simpson Brown from Koch & DeMarco, with

20  Michael Butler from Rivkin Radler, and we represent Allianz

21  Underwriters Insurance Company.

22          MS. DeCOURCY:  Good morning, Your Honor.

23  Dara DeCourcy for Lexington Insurance Company and

24  New Hampshire Insurance Company.

25          MS. PAULUS:  Good morning.  Amy R. Paulus on behalf

1   of Old Republic.

2          MR. ROGERS:  William James Rogers; with me is

3   Robert Siegel representing Associated International Insurance

4   Company.

5          MR. ANDERLE:  Good morning, Your Honor.

6   Robert Anderle representing Mt. McKinley Insurance Company

7   from the firm Seeley, Savidge.

8          MR. STEIN:  Your Honor, Robert Stein, Rudov & Stein

9   here in Pittsburgh, local counsel for Columbia Casualty

10  Company.  I have principal counsel, Patrick Hofer from

11  Troutman Sanders.

12         MR. GEIGER:  William Geiger, Your Honor, Davies,

13  McFarland & Carroll in Pittsburgh, local counsel for Howden

14  North America.

15         MR. SHINER:  Good morning, Your Honor.

16  Michael Shiner, Tucker Arensberg; and with me is

17  Carolina Salazar from Mendes & Mount representing Certain

18  Underwriters of Lloyd's London, Certain Market Insurance

19  Companies, and Equitas Insurance Limited.

20         THE COURT:  Okay.  The first thing I would like to

21  do is do the case management portion so that if any counsel

22  here are not involved in the motions and they wish to leave,

23  they are free to do so.  But that way I think it's the most

24  efficient use of everyone's time.

25         Now, with respect to the ADR process, the parties

1  have chosen mediation, and that's with Judge Donald O'Connell

2  from Illinois, and the costs will be divided equally by the

3  number of counsel appearing for each separately represented

4  party.

5          So is that still correct?

6          MR. BIRSIC:  Correct, Your Honor.

7          THE COURT:  Presently there are fifteen parties.

8  Now, who would like to take the laboring oar to be the counsel

9  to coordinate the date, time and location?

10          MR. BIRSIC:  For the mediation, Your Honor?

11          THE COURT:  Yes, for the mediation.

12          MR. BIRSIC:  I believe we have already set that date

13  for the end of January of next year.  I believe it's —— we set

14  aside three days at the end of January, beginning on

15  January 25, 26, and 27, before Judge O'Connell.

16          THE COURT:  I'll give you until the 2nd of January

17  to conduct the mediation ——

18          MR. BIRSIC:  The 31st, I'm sorry.

19          THE COURT:  The 31st also?

20          MR. BIRSIC:  Yes.

21          THE COURT:  Why don't I give you to —— is February

22  the 1st a week day?

23          MR. BIRSIC:  We're checking, Your Honor.

24          THE COURT:  I'll check, too.  I have a calendar up

25  here.  If you have a paper one it might be quicker ——

1              Yes; yes, the 1st of February, so I'll give you

2    until February 1 to complete the mediation; and the dates of

3    the mediation again are January —

4              MR. BIRSIC:  January 25, 26 and we've also reserved

5    the 31st.  So it's January 25, 26 and then the 31st.

6              THE COURT:  And it's going to be in Illinois?

7              MR. BIRSIC:  In Chicago, Your Honor.

8              THE COURT:  In Chicago, Illinois, okay.  Okay.

9              Now, the parties have submitted a 26(f) report and

10   have indicated in there the dates for amending pleadings or

11   adding additional parties, and I think everyone agrees that

12   date is December 1.  Is that still a good date?

13             MR. BIRSIC:  Yes, Your Honor, for Plaintiffs.

14             THE COURT:  Any objections?

15             Okay, so that's the date for that.

16             Now, there seems to be some dispute about the date

17   for completion of fact discovery so I'll need to hear a little

18   bit about the parties' positions on that.

19             MR. BIRSIC:  Thank you, Your Honor, if we may speak

20   first on that subject.

21             THE COURT:  Sure.

22             MR. BIRSIC:  It's the Plaintiff's position that all

23   fact discovery should end on March 15, 2012, which is

24   essentially a 120-day period.

25             THE COURT:  Are there people abroad that have to be

1  deposed?

2          MR. BIRSIC:  I do not believe so.

3          THE COURT:  So it's all domestic discovery.

4          MR. BIRSIC:  So from —— from our standpoint, that

5  would be true.

6          And we also, Your Honor, have had substantial —— in

7  an effort to provide information in advance of any discovery

8  requests from Defendants, we have also produced a significant

9  amount of information already.  We've produced over 8,000

10  pages of documents including coverage charts, all the

11  insurance policies, the underlying exhaustion information on

12  the other program, the settlement agreements, the consents,

13  erosion reports that we've received from all the underlying

14  insurers, the historical erosion reports from Utica,

15  spreadsheets from the underlying asbestos claims, all of our

16  corporate history documents, underwriting files, carrier

17  notice letters, and a significant amount of information

18  regarding the underlying asbestos claims.

19          We're also preparing to produce shortly a complete

20  database of all the underlying discovery materials in the

21  underlying cases including corporate designee deposition

22  testimony and a database that refers to all of the underlying

23  cases that have been handled under the coverage in place

24  program that was our agreement that was effectuated with Utica

25  and other insurers.

1          So, Your Honor, we have already, right out of the

2     gates, produced substantial information that's going to, you

3     know, be part of the discovery in this case, and we just don't

4     see any reason why we should go all the way out into July with

5     the discovery period.

6          THE COURT:  Okay.

7          MR. GREANEY:  For Howden, since we're kind of joint

8     claimants under the policies, we agree with the schedule of

9     the AMPCO entities.  I just wanted to emphasize that there are

10    foreign insurers that are on the AMPCO program as well.  They

11    are a minority, but Italian and Japanese and Lloyds

12    insurers —

13         THE COURT:  Part of the original Defendant group?

14         MR. GREANEY:  Correct; and there are some foreign

15    insurers over here, although a lot of them are basically part

16    of US Financial Services conglomerates.  Our point is in the

17    2009 action we found out the Hague Convention affords a more

18    streamlined procedure than our court to get the depositions

19    done.

20         THE COURT:  I'm thinking about timing to get things

21    accomplished, that's the only reason I'm asking that.

22         MR. GREANEY:  I guess our point of view, Your Honor,

23    is whatever depositions might be required abroad would be a

24    limited number and could be done within the time frame

25    Mr. Birsic suggests.

1          MR. CALOGERO:  Stefano Calogero, for Allstate.

2          I think the list of items that counsel for Air &

3    Liquid have reeled off for Your Honor underscores the

4    complexity of the litigation, and I would like to take a step

5    back and state for Allstate, as for almost all of the under

6    insureds here, this is the first time we've been asked to come

7    to the dance here.

8          There have been cases before Your Honor, at least

9    the 2009 one — I don't know if Your Honor handled the 2003

10   one —

11         THE COURT:  I did.

12         MR. CALOGERO:  What has happened is as the coverage

13   chart progresses in time, Air & Liquid has now decided to join

14   this group of AMPCO insurers from 1981 to 1985, I believe.

15   It's a four-year block.  And within that four-year block

16   there's significant coverage of towers of insurance of about

17   100 million.  A number of the insureds are in the upper

18   layers.  We need to get the information that has been produced

19   so far.

20         And I say produced so far.  It's my understanding

21   that a lot of that information has just come into my office as

22   of yesterday or Monday, and I was out of the office; I haven't

23   even looked at it yet.  But things like settlement agreements,

24   exhaustion information, policies.  Even though there aren't 35

25   policies or 40 policies named in this case, as Your Honor

1   understands from the previous cases, there are a significant

2   number of other policies that we believe need to be reviewed

3   by us, need to be reviewed in the context of the prior

4   settlement agreements.

5           One of the significant issues in this case is going

6   to be how it is that Air & Liquid is going to be able to reach

7   the layers of the Allstate coverage which was issued by a

8   company called Northbrook since we sit above a tower of ten

9   million dollars in coverage issued by a company called

10  Highlands, which is no longer with us.  They are insolvent;

11  they are in liquidation.  In order for us to be reached, they

12  have to pay the limits of those policies.

13          Now, I understand that the position is going to be

14  that that has been paid, that there are payments over a number

15  of years in order to reach us.  But that's ten million dollars

16  of defense and indemnity dollars that we're going to have to

17  review.

18          I am prepared to work very hard with opposition here

19  to get what we can get done, and also we have the ability to

20  walk and chew gum at the same time.  We're going to be

21  involved in mediation and we're going to take discovery.  But

22  I think it's an unrealistic schedule, and I say that without

23  even knowing what is going to play out before Your Honor

24  shortly after this conference with regard to these motions.

25          If these motions turn out in a certain way, the case

1    will be extremely complex and will involve foreign insurers.

2    Even if the motions are granted, the motion to dismiss is

3    granted, we now know that there's significant coverage that we

4    as insurers here are going to need to see.

5            As we sit here today, Your Honor, I have not

6    received anything from Howden's counsel about any of the

7    claims that they have.  I don't know what they —

8            THE COURT:  I guess my problem with that argument

9    would be this case, the '11 case, if you set aside for a

10   minute the motions that have been filed, involves policies

11   from the years 1981 through 1985.  The '09 case and the

12   additional Defendants that have raised the motions in the '11

13   case involve subsequent policy years; so do you need to look

14   at those subsequent years in this case?

15           MR. CALOGERO:  Yes, Your Honor.

16           THE COURT:  Okay.

17           MR. CALOGERO:  Yes, Your Honor, because the question

18   is I don't know what those policies say or how they —

19           THE COURT:  I believe they are the excess policies;

20   and your policies, for the initial Defendants in this '11

21   case, have to be exhausted first before you move up to the

22   other policies.  Maybe I'm mistaken in that.

23           MR. CALOGERO:  Those policies, as I understand it,

24   Your Honor — and again without having seen the policies or

25   understood this program, these policies were issued to Howden

1   North America's parent company which is in Scotland, and that

2   they were issued from some time period in the 1990s.  So they

3   are not — they are excess in the same sense we are excess.

4          But the interaction of those two blocks of coverage

5   has to be explored here.  There is a question as to whether or

6   not Howden, having this separate 1991 to '99 coverage, or

7   whatever the years are, has to use those policies first

8   because of certain provisions in our policies which say that

9   we may be excess to certain other policies.

10         THE COURT:  Is there a law to this effect?

11         MR. CALOGERO:  There is — first of all, there is —

12         THE COURT:  This, unfortunately, will affect the

13  motions that are currently pending, if there's such a

14  relationship.

15         MR. CALOGERO:  I can only say, Your Honor, at this

16  point that while there may not be — first of all, I don't

17  know what the policies say, but I would take as a general

18  proposition — and I would go to cases involving property,

19  first point in property coverage.  And I believe — I believe

20  there is case law that says that if you have a first party

21  property policy which specifically insures a specific peril

22  and you have another policy which specifically — which is not

23  a specific peril but covers general losses, that depending on

24  what's in the general policy's provisions, that the policy

25  with the specific peril must pay first before the general

1   policy comes in; and, in fact, that general policy acts as an

2   excess or umbrella to the specific peril.

3          Again, without seeing these policies, I don't know

4   how that plays into this case.  But in any event, I think

5   we're entitled to at least look at those policies, see what

6   claims have been submitted to them, and then the question is

7   we've never — we've never been asked to pay a claim from

8   Howden.  We've been advised of claims.  So I think that we

9   need to explore, unfortunately, Your Honor, all of the

10  coverages from all of the cases.

11         Now, what we're asking here is not a significant

12  amount of time.  I believe it's 120 to 130 days to complete

13  fact discovery.

14         THE COURT:  It's an extra —

15         MR. CALOGERO:  An extra three or four months, some

16  months and ten days.  Given the history of the previous cases,

17  given the settlement agreements that have been in place in

18  those cases — and, Your Honor, I have looked at those

19  settlement agreements, and I can tell you they are not easy

20  documents to look at.  We have to match them up with what has

21  been paid so far, and we need some $20 million in invoices

22  from AMPCO in order to prove that it's time for them to reach

23  us.  And I think that's a lot of work, and I'm prepared to do

24  it, but I don't think it can be done by March 15th.

25         THE COURT:  Okay.

1        MR. CALOGERO:  Thank you.

2        MR. GREANEY:  Your Honor, can I say one thing in

3   response —

4        THE COURT:  I would like to hear some of the other

5   parties first.  We'll come back to you.

6        Does anybody else wish to be heard on that, any of

7   the other insurers?

8        MR. HOFER:  Your Honor, would you like me at the

9   lectern?

10       THE COURT:  Yes, come up to the podium, please.  You

11  have to speak into the mike so that the court reporter can

12  hear.

13       MR. HOFER:  Thank you, Your Honor.  Pat Hofer for

14  Columbia Casualty.

15       I want to re-emphasize something Mr. Calogero has

16  just said.  There are several of us who are completely new to

17  all of these issues.  We understand that the policy holders

18  and the Court have been living with these issues for several

19  years.  We don't know anything about the underlying cases or

20  the other coverages and the — the 8,000 pages I believe

21  Mr. Birsic referred to, 7,000 we got Monday; and, actually,

22  they're on a disk, so I haven't even seen them yet.

23       We need the time to review that material, to even

24  understand what more we need.  And I — when we were seeking

25  nine months, we actually think a year is more reasonable.

1    We're trying to compromise with the other side and suggest,

2    you know, a split between six months and twelve months in

3    order to attempt to accomplish this review; and we think nine

4    months is an appropriate amount of time to do that.

5            Thank you.

6            THE COURT:  Thank you.

7            Does anybody else wish to be heard on that?

8            I'll hear back from you now.

9            MR. GREANEY:  Thank you, Your Honor.

10           Could I actually look -- show you something on the

11   chart?

12           THE COURT:  Okay.

13           MR. GREANEY:  The first point I want to make is

14   Mr. Calogero mentioned that they haven't gotten anything from

15   Howden yet.  They're going to get a data dump, similar to what

16   Mr. Birsic described, very shortly from us, including all the

17   policy related information, as well as information about

18   Howden's defense costs and claim payments, as well as how

19   they've been allocated to all these policies for purposes of

20   exhausting the underlying layers.

21           You may find it hard to see, but the cross-hatching

22   shows the substantial erosion, and the green layers which were

23   the layers at issue in the 2003 action -- and the second point

24   I want to make about apportionment is anytime that you have a

25   policy holder alleging under multiple trigger rules that all

1    these insurers' policies have been triggered and they're

2    jointly and severally liable for the same underlying asbestos

3    claims, you're going to have ancillary allocation,

4    apportionment disputes between and among the insurers who

5    issued these trigger policies or subscribed to them, and

6    that's what Mr. Calogero was referring to; and the law has

7    developed a fairly Byzantine set of rules for resolving those

8    inner insurer allocation and apportionment disputes that are

9    based on other insurance clauses and their policies which

10   provide rules for allocating among insurers.

11          What we don't agree with on is that doesn't affect

12   each triggered policy's obligation to the policy holder.  But

13   he is quite correct that when the same underlying claims

14   trigger all these policies, under an indivisible loss theory

15   of liability, the insurers then assert contribution

16   apportionment claims against one another; and you might have

17   noticed in the pleadings that eight or ten of the insurers on

18   the AMPCO side of the ledger have already asserted

19   cross-claims for apportionment and contribution against these

20   insurers on the HNA only side of the ledger.  So I just wanted

21   to clarify that.

22          THE COURT:  Okay.

23          MR. CALOGERO:  I would just reply the words "data

24   dump" and "Byzantine rules" say it all in terms of —

25          THE COURT:  — the complexities; I understand.

1          MR. BIRSIC:  Several points, if I may.  First, every

2     insurer Defendant and I dare say every counsel present here

3     today are highly experienced in asbestos insurance coverage

4     matters; and so what may seem complicated to someone who has

5     no involvement in these matters is far less complicated to

6     those that are part of a — a very experienced bar.

7          And these Defendants have been living with asbestos

8     insurance coverage issues for now, what, almost three decades;

9     and so I dare say that, you know, getting policies and looking

10    at them and determining under the existing case law whether

11    you have some arguments on allocation is a legal issue which

12    is not going to take 'til July to sort out, nor is it going to

13    take much if any factual discovery.  You get the policies.

14          In this case, as Your Honor knows, I'm not sure if

15    it would be helpful, but I have some coverage charts that

16    would reflect that all the prior coverage in the prior suit

17    for the most part was a group of insurers that were

18    predominated by Utica, and there was a coverage in place

19    agreement that was produced in April of this year to all

20    Defendants with a substantial number of the policies and

21    substantial information that we voluntarily produced back in

22    April of this year.

23          Utica has been, you know, managing the underlying

24    claims process, making the allocations, issuing allocation

25    reports.  Those allocation reports are, I would submit,

1   familiar to every Defendant in this courtroom because they are

2   all party to dozens if not hundreds of similar, you know,

3   types of agreements with their own insureds.

4             And so you get those allocation reports.  You know,

5   that's the information that we're relying upon to state that

6   the underlying policies are exhausted and what percentage of

7   those underlying payments were allocated to us under the

8   Highland's policies — and this is not anything that, while I

9   say it's not uncomplicated, it's not something that, you know,

10  you throw your hands up and say:  Oh, my goodness; we — you

11  know, we've never been involved in a coverage case before.

12  How can we read that settlement agreement and understand it?

13  How can we take the erosion report that Utica has been doing

14  for, you know, years and years and years and possibly

15  understand that?  You know?

16            I just don't — I think that rings hollow; and I

17  think that, you know, we need some firm deadlines on factual

18  discovery to sort out what discovery is actually going to be

19  taken.  I can tell the Court right now we have no intention

20  right now of running overseas to be taking depositions of

21  insurers about, you know, high level insurers.  We believe

22  that this can be fully accomplished by highly experienced

23  counsel rolling up their sleeves and getting this done, you

24  know, within 120 days.

25            Thank you, Your Honor.

1            THE COURT:   The problem for the Court is that, as

2    the two counsel for the insurance companies had spoke today,

3    if they're just getting material today, we're approaching the

4    holiday season, which is problematic for time purposes.   So —

5    and you also have the mediation in January, and I do want

6    people to focus their attention on trying to resolve the

7    cases.   And if you may be not going full bore until then, I'm

8    sure you're going to have to do quite a bit of review so you

9    can be prepared for that; but it may not be with the same

10   intensity if there's a failure to settle in terms of saving

11   costs for the various clients.

12           So at this stage what I'm going to do is I'm going

13   to give you until the end of May, and I think that would give

14   you — you'll be working towards reviewing — getting ready

15   for the mediation.   You'll have to do a lot of review and

16   preparation for that, and then immediately after that you

17   should turn your full attention to accomplish over those next

18   several months the completion of the fact discovery.   And I

19   think with an additional — essentially two months, you should

20   be able to do it by the end of May.

21           If you go into July, then you're back into the

22   holidays and the vacation cycles and people are gone, and I

23   think it would benefit everyone to have this fact part done

24   before June 1st so that if there's going to be any expert

25   discovery, we can start getting that scheduled and we can be

1    moving quickly to try to get the case resolved.

2           I don't want it to languish.  The '09 case took

3    quite a bit of time because of discovery disputes and things

4    like that that we just finally resolved, and I think we're

5    back on track there, but I don't want this case to languish;

6    and so I think we do need to work as hard as possible to

7    accomplish that.

8           So we will have -- I'll have a requirement that fact

9    discovery be completed by May the 30th of 2012, and that by

10   April 15 any form of discovery for which the civil rules

11   provide a 30-day response period must be served.  That would

12   be production of documents, interrogatories, requests for

13   admission; that gives you 30 days for any responses to come in

14   and a couple weeks to work out any problems.

15          So if we look at the first week in June, we will

16   schedule our conference at the close of fact discovery.  June

17   the 1st is -- June the 1st is a Friday; is that good for

18   everyone?  Or would you prefer to do it during the midweek if

19   you have to travel to get here?  Is there a preference?

20          Okay.  Why don't we have our conference at the close

21   of fact discovery, then, on June the 1st at 10:30 a.m.  Okay?

22          Now, the only other thing I want to take up with you

23   is the responses that you have made to the questions with

24   respect to electronic discovery.  And I'm just -- I may be not

25   familiar enough with everything that is going to be produced

1    and maybe you've all worked together and this is something

2    that's not a problem, but I need to understand that you agree

3    that appropriate search terms may be necessary, but everything

4    is premature.

5            You're telling me that you haven't focused on

6    electronic discovery and any problems that could arise in

7    that, so can you tell me what the status is?  Is this the type

8    of thing that's not really of a significant issue in these

9    type of cases?

10           MR. McGONIGLE:  Your Honor, David McGonigle for the

11   Plaintiffs.

12           We don't anticipate we'll have significant issues in

13   these cases.  There are some electronic things, obviously,

14   with respect to claims, handling and so forth that will be

15   being produced.  What we would suggest, if we do have a

16   problem in that regard, that we would — once we've continued

17   to make the substantial productions that we're making, the

18   parties be directed to sit down and discuss that, if they have

19   a problem, but we don't anticipate there will be.

20           When we discussed this on the Rule 26(f)conference,

21   which extended over multiple calls, none of the parties

22   anticipated that there would be significant issues in that

23   regard, so that's why we reserved this issue in the report.

24           THE COURT:  How about from the insurers' side?

25           MR. CALOGERO:  I agree, Your Honor, that these are

1   issues that we can look at once we get documents.  I think the

2   question with electronic discovery is what is the form of what

3   you're getting that discovery.  So far as I have seen —

4           THE COURT:  It's also how you conduct the search.

5   If you have a gazillion documents and you're going to do a

6   search, there's always issues that come up on how you frame

7   the search, what the search terms are; and I — and I and the

8   other judges of this court like to have those matters on the

9   table early in the litigation so that it doesn't become an

10  overwhelming problem where you get into extensive fights on

11  things that have already been produced and then there's

12  questions of, well, I didn't know that they were going to do

13  this, and it just can become an expensive problem down the

14  road if it's not addressed early on.

15          MR. CALOGERO:  My only point is — is that I — I

16  know that documents have been produced.  I understand what

17  they are.  I can't say what it is until I see the documents,

18  what search terms we're talking — what the search terms —

19          THE COURT:  I mean they've already produced

20  electronic documents.  The question is if you're going to have

21  another request out to them, you don't think you have

22  everything you need, and then you're going to come and say how

23  did you do the search, how did you find these were the

24  documents — that's really the type of question.

25          MR. CALOGERO:  Well, again, until I see what they've

1  produced, I don't know, you know, what else I can ask them.

2  It may very well be that what they've produced is all that I'm

3  ever going to get from them with regard to those particular

4  topics.

5         THE COURT:  Well, what I would like you to do is by

6  January the 15th to file a Supplemental Paragraph 11 from

7  the 26(f) report, and that way I'll know if there's any

8  problems and I can — then you'll be focused on it and we can

9  try to get those resolved as soon as possible.  And by that

10  time you should have looked at things and you'll have a sense

11  about whether there's going to be a problem or not.

12         Is that a fair assessment?

13         MR. CALOGERO:  I think so, Your Honor.

14         THE COURT:  Okay.  So we'll give you until

15  January 15th and then you can file a revised 26(f)

16  Paragraph 11.  That's the only paragraph that you've got to

17  modify.

18         Okay?

19         MR. McGONIGLE:  Thank you, Your Honor.

20         THE COURT:  Okay.  I think I've addressed — is

21  there anything else on the case management side that anyone

22  wishes me to focus on at this stage?

23         MR. McGONIGLE:  Your Honor, if I may,

24  David McGonigle for the Plaintiffs.

25         We did note in the Rule 26(f) report that we thought

1    that while discovery did not need to proceed in phases — this

2    is on Page 7, Your Honor — that the motions for summary

3    judgment, including motions for partial summary judgments, may

4    be filed during the course of discovery.  We're not saying

5    that will necessarily need to happen, but —

6            THE COURT:  This is what I'm going to ask you to do

7    because I have particular requirements with respect to summary

8    judgment motions, whether they're partial or complete.  And if

9    you feel that it's — the time is ripe to file a summary

10   judgment motion, I'm going to ask you to contact the Court's

11   chambers to schedule a hearing on that.

12           So it can be by telephone call, and I need to know

13   why you think the time is ripe for it because what I don't

14   want to have is to have all these serial summary judgment

15   motions and I still have to have a big summary judgment

16   motion; and it's more efficient if things are orderly.

17           Now, if there's something that's dispositive for one

18   particular thing that will really help the case move forward,

19   then I would entertain a summary judgment motion, you know,

20   even though fact discovery is not completed.  But, typically,

21   I take up the issue of whether there are going to be summary

22   judgment motions at the post fact discovery conference.

23           So I'm going to ask that if you would like to have

24   summary judgment motions earlier than at the end of fact

25   discovery, that you notify the Court and request a scheduling

1    conference on that, and then we can do that by phone, if

2    that's most efficient for everyone, and then you can tell me

3    why you think it would be helpful to the case to have it at

4    that — at this stage.  And then I'll — if I agree with that,

5    then I will enter an order and set the times out and the

6    framework and how I want those motions to be filed.

7            MR. McGONIGLE:  Very good, Your Honor, thank you.

8            THE COURT:  Is that acceptable to everyone?

9            Okay.  Anything else:

10           MR. NATHANSON:  Your Honor, Larry Nathanson.

11           We also said in the Rule 26(f) report we anticipate

12   sending you a stipulated protective order.  We are working on

13   a draft.  I think there are a couple issues we're trying to

14   work out; but maybe Mr. McGonigle can confirm, we hope to get

15   you something soon.

16           THE COURT:  Okay.

17           MR. NATHANSON:  It may not be by the end of

18   November, it may be early December.

19           MR. McGONIGLE:  Hopefully it will be shortly.  I

20   doubt it would end up in December.  We hope to do it shortly.

21   We need to confer with counsel for Howden and we checked with

22   the insurers — in fact, we had a pre-mediation session

23   yesterday.  I won't get into the contents of it, but

24   separately we discussed the stipulated protective order and

25   we'll address that with them.

1          We've sent the most recent draft to them but have

2     not had a chance, in view of the timing of when our meeting

3     ended and this morning, to finalize that.  And I should note,

4     Your Honor, either — it may be separate with that, we will be

5     exploring with the Defendants a Rule 502 agreement and order.

6          THE COURT:  Okay.

7          MR. McGONIGLE:  Given the sensitive nature of the

8     underlying claims data that we'll be producing and our mutual

9     shared interests in insuring that that data not be produced in

10    a way that affects the privilege waiver as to the underlying

11    claimants that are mutual antagonists, if you will, we will be

12    addressing that with them as well.

13         THE COURT:  So that will be a separate order on

14    that.

15         MR. McGONIGLE:  I believe that will be a separate

16    order because a protective order is almost done.  So they

17    could be together, but more likely they'll be separate.  And

18    in any event, we'll work to have those in by the end of the

19    month.

20         THE COURT:  Okay.  Good.

21         Anything else on case management?

22         Okay.  Now, we'll move to the next stage.  I want to

23    take up the — first the motions in the '09 case.

24         MS. CLEMENTS:  Your Honor, should I approach at this

25    time on the '09 motion?

1          THE COURT:  If you want to wait a minute, I will

2   give you some issues I want you to address.  You may want to

3   take a minute to think about those.

4          In the '09 case there is a docket entry at ECF

5   No. 283, a second motion to dismiss on forum non conveniens

6   which was filed by HDI-Gerling; and then there was a ECF

7   No. 289, a motion to dismiss or alternatively stay also filed

8   by Howden — also filed — excuse me, filed by New Hampshire

9   Insurance — New Hampshire Insurance Company.

10         Now, the one issue that I'm really struggling with

11  at this stage is the '09 case has been moving along for

12  several years.  There was extensive mediation that took place.

13  There's extensive discovery that has already been — has taken

14  place.  So — and it's my understanding that that's all come

15  to a close now.

16         I think all the outstanding issues that were

17  raised — I had a special discovery master that was brought

18  in.  In subsequent following hearings I had sealed a document

19  and I am — there's a motion for reconsideration on the motion

20  to seal document which I do want to take up at this time.  And

21  this was filed, so we can address that as well.

22         But at this stage, with everything that was coming

23  to a head, so to speak, in terms of all the work that has been

24  done here, this case is going to be ripe.  There's a

25  proceeding recently filed by these two Defendants in England,

1  and now they want to come here and say:  Stop everything,

2  everything you've done is for naught, don't move any further.

3        And I already had a similar forum non conveniens

4  issue raised quite a while ago.  That was denied and now it's

5  back again.  So I have a question really with respect to

6  New Hampshire about the timeliness of this.  I mean isn't it,

7  you know, this kind of action, too late to be filed?  And I

8  don't have any robust briefing on that issue from the parties.

9        And with respect to HDI-Gerling, the Court having

10  already denied it, isn't that really just a motion for

11  reconsideration and that should be judged under the standards

12  for a motion for reconsideration?  And that wasn't directly

13  addressed by the parties either.

14        So those are, you know, some of the threshold issues

15  I have; and I find it very problematic that it's being raised

16  at this late stage in the '09 case with all of the matters

17  that have been undertaken to date in that litigation.  So with

18  that I'll turn to you.

19        MS. CLEMENTS:  Your Honor, this motion needed to be

20  filed based on external factors, things beyond our control

21  that have happened in recent times.  We have the Faraday

22  action filed in England addressing a policy in the 1998 policy

23  year.  That's the same year that we have at issue in the

24  Howden.

25        In response to that —

1              THE COURT:  So the '98 policy is at issue in the '09

2     case?

3              MS. CLEMENTS:  In the '09 case, the 1998 first layer

4     excess policy sits just below the Faraday policy that's at

5     issue in England and has just been the subject of a judgment.

6     We also —

7              THE COURT:  It's not really a judgment.

8              MS. CLEMENTS:  That's their nomenclature.

9              THE COURT:  Our parlance —

10             MS. CLEMENTS:  I'm using what it is titled in the

11    court there.  In reaction to the Faraday action, we had the

12    Howden North America matter going to the 2011 AMPCO —

13             THE COURT:  Let's forget about the '11 case.  Let's

14    look at the '09 case.  I think they may turn out to get the

15    same result, but I think there's a — you know, a significant

16    difference between the postures, given that the '09 case is

17    getting ripe to move to the next stage, which would either be

18    a dispositive motion or set for trial.

19             MS. CLEMENTS:  Your Honor, as an initial matter, we

20    can't really let go of the 2011 matter because it has the same

21    policy year as the Faraday and as the '09 action.

22             THE COURT:  It's a different policy, though, right?

23             MS. CLEMENTS:  Yes, but all following form, as

24    Howden's mentioned.  They're all follow form to each other or

25    have the exact same language.

1            THE COURT:  Doesn't that mean the English court got
2    it wrong then?  If the follow form — and this was going to be
3    another question I had, particularly with the '11 case — if
4    that's the standard and I have all these decisions to be made
5    and it's follow form, and it's first filed here, I've already
6    resolved the issue on forum non conveniens when it was raised.
7    And just because now HDI and New Hampshire want to sidetrack
8    all of this litigation that has gone on and go over to England
9    because they think they're going to get a favorable ruling
10   there — it just doesn't strike the Court as a proper process.
11           MS. CLEMENTS:  Your Honor, to first address the
12   2008 — we are not going to be able to escape the fact that
13   now the 1998 policy is going to be in England.  The London
14   court has ruled that that is an appropriate forum and that —
15           THE COURT:  You can have competing forums.  I know
16   it's something we try to avoid, but just because England wants
17   to ignore what this court has been doing for years, and if we
18   have a '98 policy that is going to be in play as the forum
19   that is going to follow form over there, and we're ready to
20   get a resolution on those — on that matter, and that happens
21   to impact here the other policies — and I have read the — I
22   have read the decision that was given in the English courts
23   with respect to why they felt that the English law would be
24   appropriate; and I — I may follow that here or I may say that
25   that's not the case.

1              But at this stage it strikes the Court that it would
2    be very similar to any situation we would have here in the
3    states.  If there's a later filed case that's going to raise
4    issues, that you don't stop everything in the prior case.  You
5    know, it really should be that the later case should have
6    deferred — and maybe these issues weren't fully briefed or
7    apprised to the British court.  I'm not sure if the follow
8    form issue was raised and that the court understood that, that
9    we're going to be making decisions here that could affect what
10   they're doing over in England; and maybe they should have
11   stayed it and waited to see what happened here.

12             But the court in England made its decision, and I
13   have to make an appropriate decision, too.  But I just
14   don't — I can't see that all of the time and effort that has
15   been put into this, when we're ripe and they're just starting
16   over there, why we wouldn't finish.  We are a proper — this
17   court is a proper forum.  There is no question about that.  So
18   this court has jurisdiction.  This court can hear these cases.

19             So at that posture, I am really struck by what I see
20   as an effort to do an end run around this Court in terms of
21   the work that has already gone on and a decision that I had
22   already made that the forum non conveniens was — which was
23   considered was denied.

24             Now, I understand people have dropped out of the
25   case and we're left with HGI and — HDI and New Hampshire.  A

1   lot of the other parties have settled in the '09 case.  But we

2   still are moving ahead in that case.  And New Hampshire in

3   particular —— I mean New Hampshire isn't a British entity,

4   it's here, and — it just strikes the Court as very odd, quite

5   frankly, with respect to the '09 case.

6           But I'll let you make your arguments.  I wanted you

7   to hear the concerns that I had in light of the arguments that

8   were raised in the brief.

9           MS. CLEMENTS:  Thank you, Your Honor.

10          The Faraday action, hitting the same policy, 1998,

11  plus the later policies on which our client HDI-Gerling also

12  participates, raises one issue.

13          THE COURT:  So you want the later policy to control

14  the earlier policies, is that —

15          MS. CLEMENTS:  Not that they're controlling each

16  other, but that action is out there.  And Howden's reaction to

17  that in filing their amended answer in the 2011 action, we

18  have another split of the 1998 case.  So now we have

19  HDI-Gerling —

20          THE COURT:  I'll take that up in the '11 case.

21  There may be a need to sever those claims out in the case.

22  I'm talking about the '09 case.  Why should I dismiss — take

23  that drastic action of dismissing an '09 case after everything

24  that's gone on in this court with respect to those policies,

25  considering that the Plaintiff's choice of forum was here,

1    considering I have already addressed forum non conveniens,

2    denied it; and then, just because a British court years later

3    decides for a later policy, a different — a similar forum but

4    different policy year based on English interpretation of how

5    they would determine the matter, which I may or may not

6    follow, but — I don't know why I would defer to the British

7    courts given everything that has happened.

8            MS. CLEMENTS:  Your Honor, the court in England

9    has —

10           THE COURT:  With all due respect to the British, to

11   the court in England.

12           MS. CLEMENTS:  And certainly you see in that opinion

13   the court has also shown some deference to this court.

14           THE COURT:  Yes, but I don't know that they

15   understood the arguments about the prior forum's going to be

16   controlling; and so what they would be doing is essentially

17   trying to strip this court of jurisdiction to hear the pending

18   case that's been here for years.

19           MS. CLEMENTS:  By this point the ruling on either of

20   those policies may not be binding on the other court's

21   determination of those — of coverage under those policies, so

22   you may actually have conflicting rulings coming out in the

23   same tower; and then obviously leaving the '11 aside, those

24   clients have not had the opportunity in the '09 case to

25   express any positions on those policies, to have any say as to

1   the ruling on that policy.

2           And if the position is going to be taken that the

3   2008 ruling from the '09 action is then going to be somehow

4   binding on the '011 clients of ours, that's an issue that we

5   haven't had an opportunity to be heard on that.

6           THE COURT:  I'm talking about the '09 case now.

7           MS. CLEMENTS:  Yes, yes.  Also, the -- there's a

8   serious concern as to the policies that cannot be addressed in

9   the '09 or the 2011 case, and that is the 1999 and later

10  policies.

11          Now, I know Howden said in their opposition that

12  those -- they're not making a claim under those later

13  policies.

14          THE COURT:  They are going to be judicially estopped

15  from making a claim, at least in the US, based on their

16  representations to the Court.

17          MS. CLEMENTS:  The letter we attached, though, as

18  Exhibit D to my declaration, that very recent letter we

19  received for the clients of the English proceedings, there's a

20  paragraph that says:  We will not now and never will seek

21  coverage for these claims.  But if you read it very carefully,

22  they're only talking about present and past claims that have

23  not reached those excess layers.

24          The very next paragraph says, essentially, we

25  haven't made any projections of the future, which is something

1    we hear constantly.  There's no projection as to what the

2    claims are going to hit, what layers, and how fast; and they

3    are not —

4          THE COURT:  Those later policies, don't they pick

5    the UK law?

6          MS. CLEMENTS:  Absolutely.

7          THE COURT:  And that's a big distinction between the

8    other policies, so they're not the same forum.

9          MS. CLEMENTS:  There is certainly going to be

10   another claim at some point on those policies, and they have

11   left themselves open in that letter.  They have not given up

12   the claims in the '99 and 2000 policies; and that's the reason

13   our clients felt that we needed this action, to put everything

14   together and resolve those Howden group policies.  And that is

15   the English proceedings we have filed over there.

16         MR. GREANEY:  Can I eliminate that strawman once and

17   for all?  The English court dismissed two post '99 policies

18   that they tried to bring in on the grounds there is no

19   justiciable case in common seeking coverage.

20         We expect the same result in the case that Gerling

21   and New Hampshire have filed.  We told them eight different

22   ways to Sunday that we are not and will not be seeking

23   coverage under those UK choice of law clause policies.

24         THE COURT:  Even in the future.

25         MR. GREANEY:  Even in the future, okay?  So I'm on

1   record as saying that once and for all.  They're out of the

2   mix, just like they're out of the mix in the eyes of the

3   English judge.  So everything that AMPCO and Howden are

4   seeking coverage for is right here.

5           THE COURT:  Forever and ever and ever.

6           MR. GREANEY:  Forever and ever and ever is before

7   this Court unless I find some super high level excess policy

8   that nobody has heard of, you know, within this tower.

9           THE COURT:  To your knowledge there are no other

10  policies that would provide coverage for these types of

11  claims —

12          MR. GREANEY:  Correct.

13          THE COURT:  — that Howden could look to.

14          MR. GREANEY:  Correct, Your Honor.  There is a

15  cottage industry of insurance archeologists out there that

16  companies like Howden and AMPCO hire to scour the universe to

17  try and find policies.  We've been there and done that.  The

18  key point is the 1999 and later policies with UK choice of law

19  clauses are out of the picture.  The English court recognized

20  that and we respectfully submit that this Court ought to as

21  well.

22          MS. CLEMENTS:  Your Honor, it is only this week that

23  we have ever heard this position; and, in fact, the motion for

24  leave to file an amended complaint in the '11 case mentioned

25  higher or excess policies that included two excess policies

1   following form, two -- those underlying policies in the '09

2   case.  They had to have meant upper layer policies in later

3   years.  There are no other policies.  This is the first we are

4   hearing it.  When the English proceedings were filed, it was

5   still our understanding that claims were proceeding.

6           THE COURT:  It's good everybody is here today to get

7   this clarified.

8           MS. CLEMENTS:  I would want to be sure there is some

9   binding way to be sure about that, in both countries there

10  be -- not be another claim.

11          THE COURT:  I don't think I can bind what's going to

12  happen in Britain, but I can certainly take this as judicial

13  estoppel because they're making a representation to this

14  Court.

15          Do you dispute that?

16          MR. GREANEY:  Not at all, Your Honor.

17          THE COURT:  Okay.

18          MS. CLEMENTS:  If I can continue, in the Faraday

19  court the Court said we'll take statements on the later two

20  policies, to get something that is binding.  Even that court

21  has some misgivings whether that is legally binding --

22          THE COURT:  Do you want to prepare a submission to

23  the Court that Howden Buffalo's counsel can sign, and submit

24  it to the Court, where there is a firm acknowledgment in

25  writing that will be docketed in this court that can be clear

1   to the world?

2           MS. CLEMENTS:  That would certainly be a positive

3   development on a going-forward basis, but it does explain why

4   our clients made the decision they made at the time they made

5   it, that it is just now that we're hearing about this

6   relinquishment of claims, '99 and later.  It really is news to

7   us.

8           THE COURT:  Okay.  Let's get back to the '09 because

9   those are not at play in that issue.  Do you have anything

10  else you want to bring to my attention?

11          MS. CLEMENTS:  Your Honor, as you know, in Windt

12  versus Qwest Communications, you can look at facts as they

13  stand today and the —

14          THE COURT:  The problem I have with HDI is this is a

15  motion for reconsideration.  I already decided this motion.  I

16  mean this is a problem.  I didn't get a lot of robust briefing

17  on this, you know.  Can you have serial forum non conveniens,

18  that I have to continually look at different circumstances

19  even up to the time of trial, or maybe you're going to raise

20  it at trial?  I mean where does it end?

21          MS. CLEMENTS:  Your Honor, there is no case that

22  looks like this case because this case is extraordinary to

23  have this much going on with the same policy year being split

24  among four different courts.  These are extraordinary

25  circumstances, and it was only at this point that we felt —

1              THE COURT:  Four different courts?  I thought there

2    was this —

3              MS. CLEMENTS:  Four actions; two actions in London

4    and two actions here.  And it is only those extreme

5    circumstances that force us to bring these motions at this

6    time.

7              We had been proceeding through discovery after that

8    motion was denied the first time and just — this is the

9    circumstances we're under, and we needed to take this action

10   at this time.

11             MR. GREANEY:  I'm not going to say a whole lot,

12   Your Honor, but I just wanted to point out to you that we in

13   fact did address the law of the case doctrine in some detail

14   in our brief at Pages 10 to 15, and we addressed the

15   correlating rule in the Third Circuit in Lony and other cases

16   that it is wholly inappropriate in most circumstances to give

17   Defendants a redo on a forum non motion when there has been

18   substantial merit-related activity and certainly when

19   discovery has been completed.

20             And if you would like to look at some of the cases

21   we cited that deal with the law of the case doctrine and the

22   context of forum non motions, they are at Page 12 of our

23   brief.

24             THE COURT:  Do you have any response to those, that

25   case law?

1          MS. CLEMENTS:  I don't know.  I don't believe we

2     addressed them in the reply brief.  I certainly —

3          THE COURT:  That was my recollection.

4          MS. CLEMENTS:  There's certainly — the

5     circumstances are completely different and it's not as if we

6     have a month later asked the Court and a month later asked the

7     Court.  These are extreme circumstances —

8          THE COURT:  But you're asking the Court after

9     discovery is virtually completed.

10          MS. CLEMENTS:  At that point the discovery that's

11     completed certainly aids all parties in a final resolution of

12     this case no matter what court it ends up being in, and it is

13     definitely not for naught, what has been done to date.

14          MR. GREANEY:  That is plainly not correct.  None of

15     the pretrial discovery depositions we have taken are usable in

16     England; we have noticed those —

17          MS. CLEMENTS:  In the discovery that has been done

18     to date in the '09 case, I have found to have been valuable.

19     Even though they do not have the procedure, what has been done

20     can be used.

21          THE COURT:  They can't use it in court to cross

22     examine a witness or — am I correct in understanding that?

23          MR. GREANEY:  That's certainly what we've been told

24     by our solicitors in the London office.  We submitted an

25     affidavit to that effect.  They distinguish between the use of

1   the Hague Convention, for example, to get trial testimony from

2   a witness and discovery depositions; and we've taken all

3   discovery depositions because we are in a US federal court.

4           MS. CLEMENTS:  Your Honor, Howden has tried to paint

5   a picture of England as being a completely inadequate forum —

6           THE COURT:  I'm not finding it is an inadequate

7   form.  It is a different forum and there are different

8   procedures and we have done a lot of work to get ready for a

9   US federal trial; and, you know, I just — I'm just really

10  taken back about how we can unwind all of this just because

11  you want to go to England now, which you think is going to

12  give you a better or more favorable treatment.

13          MS. CLEMENTS:  It isn't even that we believe that

14  the other forum is going to give us a more favorable

15  treatment, because it is our position that English law can be

16  applied in this court.  The matter is other policies could not

17  be handled in this court.  The '99 and later policies we were

18  left with could not be resolved here because of the choice —

19          THE COURT:  That's not an issue now.

20          MS. CLEMENTS:  At this point now we have a divided

21  tower with the old — the 2011 case and those clients of ours

22  not being able —

23          THE COURT:  The '99 policy is not in issue.  We have

24  judicial estoppel on that.  You're going to prepare a

25  statement to be signed verifying that.

 1              MS. CLEMENTS:  That was the '99 and later policies.

 2      I'm talking about the 1998 tower that has now been split

 3      between three actions; and I —— it is really our position that

 4      we can have English law apply here.  And I believe Your Honor

 5      has acknowledged there is a possibility that we can get

 6      English law applying to those policies, so it isn't shopping

 7      for a choice law.  That can be done here.  And we had that in

 8      our reply brief as well, that courts frequently apply foreign

 9      laws in cases in the federal courts.

10              The matter is you could not get the '99 and later

11      policies addressed in this court, and now we have a split of

12      the 1998 tower among the three cases.

13              THE COURT:  Well, the '99 is not an issue any

14      longer.

15              MS. CLEMENTS:  The 1998, that's the one split.  In

16      2011, in 2009, in Faraday ——

17              THE COURT:  What I'm not sure is that the British

18      court understood that when the decisions would be made in the

19      '09 case, they would impact that '98 policy because of the

20      follow form.  And I didn't see any reference to that in the

21      decision by Justice Beatson.  Did anybody see that or am I

22      overlooking something?

23              MR. GREANEY:  I was at that hearing, Your Honor, so

24      I mean I can —— you know, Justice Beatson was bound by,

25      applied English precedent.  He obviously wasn't applying US

 1    precedent which is, to be self-evident, binds this Court.  He

 2    very definitely viewed the ten percent fragment of one policy

 3    subscribed by Faraday as a separate contract that could be

 4    divorced from the rest of the program.

 5            I mean there is no question that that's how he

 6    viewed it, and that might well be how the English courts view

 7    it.  But it is manifestly not how the United States, including

 8    Third Circuit precedent, views the type of form non program.

 9    Not at all.

10            So he did, in our view, respectfully, disregard the

11    core economic purpose of a follow form insurance program,

12    which is to provide uniform, seamless protection to the policy

13    holder all the way up the chain at each layer of coverage.

14    And since you are already going to interpret and apply the

15    lead lower layers of the tower, your interpretation and

16    application of those policies will necessarily govern and be

17    dispositive of the interpretation of the identical policies

18    higher up because they're not even policies.

19            THE COURT:  Was he apprised of that or did he

20    understand that?

21            MR. GREANEY:  Our barrister tried to apprise him of

22    that, and his view was Faraday didn't know he was signing onto

23    a comprehensive insurance program.

24            With all due respect, they did.  They most certainly

25    did.  They don't have a separate policy with their own

1  language over here.  The language is down here.  The orange

2  and green which are before you, that's the actual guts and the

3  wording of the policy language.  These purple follow on

4  subscribers up here, they don't issue a policy; they just

5  issue an underwriting slip that says "wording as underlined,"

6  and they sign on for the ride to various percentages all the

7  way up to 200 million.

8          So they don't even have their own independent policy

9  language.  What they agreed to do is to be bound by the

10  wording and the interpretation that is given to the lead layer

11  down below, which you had before you for two-and-a-half years.

12          So there's two purposes of that follow form

13  insurance program.  The first is it reduces the transaction

14  costs of buying insurance by instead of having to negotiate

15  separately with 30 different underwriters, you just negotiate

16  with the lead underwriter, which in this case was XL — you

17  may remember XL was before you in the '03 action.  They're

18  paying.  They're participating in the funding agreements.

19          So XL structures the program.  XL writes the

20  coverage.  And then everybody else signs on for percentages

21  all the way up the chain.  So the Third Circuit — the second

22  function of a follow form program is to obtain uniform,

23  seamless coverage all the way up the chain.

24          The only reason that we brought these policies in

25  before Your Honor is because we want them interpreted

1  consistently and uniformly and efficiently rather than

2  balkanized piecemeal fashion with different judges on

3  different continents applying different rules and different

4  legal regimes, interpreting them eight different ways to

5  Sunday.

6         We didn't, what they say, split the tower.  We

7  haven't split anything.  From the get-go dating back to 2003

8  every single claim that Howden has made for coverage under

9  every single policy at every single layer impacting every

10 single year has been brought in one forum, this one.  Under

11 one judicial roof and before one judge.  We're not looking for

12 special favors.  We're not looking for special treatment.  We

13 know you're going to call it as you see it.

14        But we can't have -- with this ruinous exposure that

15 we're potentially faced with, these asbestos liabilities that

16 have put 150 companies into bankruptcy, we cannot have a

17 comprehensive program of an identically worded occurrence

18 policy construed ten different ways; we can't do that.  We

19 have to have it construed one way by the same judge.

20        And in the Houbigant case which we cited in our

21 briefs, the Third Circuit made the point that I just made.

22 They said in a follow form program, the high level players

23 agree they will be bound by the interpretation that the Court

24 affords to the lead low-lying policy.

25        So the bottom line is this:  We haven't split

1    anything.  We haven't balkanized anything.  We're here looking
2    for justice and consistency and uniformity from one judge.
3    There is balkanization, there's piecemeal litigation, there's
4    increased costs, and there's a risk of inconsistent results
5    going on here, but it's not coming from Howden.

6           THE COURT:  Somebody want to be heard?

7           UNIDENTIFIED ATTORNEY:  I wanted to address the
8    issue of whether the judge addressed it, and it's at
9    Paragraph 72 of his judgment.  He found as a matter of English
10   law, while the English court will show all appropriate comity
11   to the Pennsylvania court, the interpretive rulings of the
12   latter with respect to the underlying policy will not create
13   precedent applicable to Faraday.

14          THE COURT:  Which is directly contrary to the law in
15   the Third Circuit.  I mean they — but my problem is I don't
16   see why, because the English law doesn't want to recognize
17   that if I have cases pending here, where I have proper
18   jurisdiction and it would be applied, why would this Court,
19   given two-and-a-half years have passed, extensive discovery
20   has taken place, why would the Court turn it over to the
21   British courts and dismiss this action?

22          It just doesn't make any — it just doesn't make any
23   sense in this court.

24          MS. CLEMENTS:  Your Honor, the jurisdiction issue
25   aside, there will still be a choice law determination made in

1   this case; and with all the contacts that are with these

2   policies, with issuance in pounds, issuance from London

3   brokers on London brokering forums, the London-based insurers,

4   the idea that it's going to be Pennsylvania law applied to

5   these policies, I am just having a very hard time finding any

6   basis for that; and then also I don't understand how —

7              THE COURT:  I think you will find a disagreement

8   with the other — with the — with Howden Buffalo on that.

9              MS. CLEMENTS:  I'm sorry?

10             THE COURT:  You'll have a difference of agreement

11  with Howden Buffalo.

12             Am I correct in that?

13             MR. GREANEY:  You are absolutely correct,

14  Your Honor.  I mean, number one, if in fact, as they say in

15  their reply briefs, Pennsylvania conflicts rules are the same

16  as the lex loci contractus approach that's been applied in

17  England, they wouldn't have flown the coop and gone over there

18  and filed these balkanized actions.  They would have stayed

19  here and argued Pennsylvania conflicts choice of law rules.  I

20  mean that's manifestly clear.

21             Number two, there probably have been 20 cases — and

22  I'm not exaggerating — in the United States involving

23  insurance coverage for mass torts under multiyear multilayer

24  occurrence policies that have applied some variant of the

25  flexible balancing of interest test under Restatements

1   Section 6 and 188, which was designed to supplant lex loci

2   contractus in American jurisprudence.  That's what the

3   drafter's objective was.

4          All of those cases have applied state law to the —

5   both foreign and domestic policies.  None of them have applied

6   foreign law because of the — because when you weigh the

7   interests analysis, and you've got purely underlying tort

8   liabilities only in the United States for US insureds, it's

9   virtually a given you're going to end up with state law.

10          And, finally, just to respond to the statement that

11   of course Pennsylvania law, you know, would result in English

12   law, Faraday in front of the English High Court said in a

13   sworn witness statement:  Choice of law rules in England and

14   Pennsylvania differ.

15          Then their counsel went on to say that Pennsylvania

16   conflicts rules are much broader than the English approach,

17   and they apply lots of other factors besides the contracting

18   factors.

19          Then he said:  The outcome of the choice of law

20   analysis before the Pennsylvania court could well be that the

21   English law is not applied.  That's a direct quote.

22          Then he said:  It is plain from my description of

23   the choice of law principles likely to be applied by the

24   Pennsylvania court that it will embark on a wide-ranging

25   analysis of all the issues in dispute and will not apply

1  choice of law principles similar to those applied by the

2  English court.  And then he referred to the Pennsylvania

3  choice of law rules as being based on quote non-English

4  factors, unquote.

5        So I'm not just saying this to point out that the

6  insureds have said one thing to the Court over there and a

7  directly opposite thing over here.  I'm pointing out simply

8  that clearly there are significant differences in the conflict

9  of laws rules applied in the two jurisdictions.  And therefore

10  we, you know --

11        THE COURT:  Has there been any US court in this type

12  of coverage litigation where you have this stacking that has

13  applied foreign law to the policy?

14        MR. GREANEY:  I'm not aware of one.

15        MS. CLEMENTS:  Your Honor, I would just like to

16  direct your attention to the CGU matter discussed in the

17  Faraday judgment and that we discussed in our reply brief.

18  And there that court recognized that Ohio used the Restatement

19  factors and that that was identical to English choice of law

20  principles.

21        If that's the case, then that is identical to

22  Pennsylvania use of Restatement to do choice of law; and I

23  believe -- I can't speak to what Faraday said at the hearing,

24  and I was not at the hearing, and HDI-Gerling was not

25  represented at the hearing in England --

1          THE COURT:  But my question was whether —

2          MS. CLEMENTS:  It is the same choice of law rules in

3     England and here.

4          MR. GREANEY:  They're obviously not the same.  The

5     CGU case is an English case; so I mean it doesn't

6     prove/disprove what I said.  And, secondly, it involved a

7     discrete event, not a mass tort exposure involving thousands

8     of underlying claims and hundreds of policies issued by US and

9     foreign insurers to the same policy holder.  So that really

10    doesn't disprove what I said either.

11         THE COURT:  Is there anything further that you wish

12    to be heard on the '09 issue?

13         I'm going to hear from New Hampshire.

14         MS. CLEMENTS:  I would like to point to

15    New Hampshire at this point, Your Honor.

16         MS. CASSIDY:  Your Honor, on been half of

17    New Hampshire, we did litigate before you for two years, did

18    just finish the fact discovery in that case, and we did not

19    join Gerling in their motion.

20         There has been an emerging pattern of conduct by

21    Howden over the past several years that suggests that they

22    prefer to litigate their United Kingdom coverage program on a

23    piecemeal basis.  They were before you initially with respect

24    to the primary and umbrella coverage.  Then years later they

25    came back vis-a-vis their excess program, but only —

1           THE COURT:  Doesn't that make sense to you?  Why

2    would they be suing you if they don't know they've reached

3    their limits to reach the excess levels?

4           MS. CASSIDY:  It is often the case that policy

5    holders will include their entire program at the beginning of

6    the case; and if they wish to resolve how the lower levels

7    will respond, the excess carriers will have the opportunity

8    either to participate in those discussions or, if they would

9    like to be dismissed based on the fact that their policies

10   aren't implicated yet, they would reach an agreement with them

11   that —

12          THE COURT:  Is there a case in controversy?  Can

13   they sue you if they don't know if they're going to have a

14   claim against you?

15          MS. CASSIDY:  Depends on the facts of each case.

16   Frequently the excess carriers will enter into an agreement

17   that says we're not implicated yet in terms of our policies in

18   this program.  We agree with what deal you will work out; we

19   will follow the same terms if and when you ultimately reach us

20   later.

21           There was a different way to approach the cases and

22   that was an option and Howden didn't do it.  They chose to

23   selectively address their program, first with respect to the

24   primary umbrella coverage and then later, when they did in

25   2009 turn to the excess program, they only selected six

1    policies out of the program.  Those — vis-a-vis

2    New Hampshire, those —

3              THE COURT:  Are there more policies?

4              MS. CASSIDY:  There are more policies in this

5    program at the excess level, yes, Your Honor, including —

6              THE COURT:  I thought everything has been brought in

7    now.  Is that not the case?

8              MR. GREANEY:  Correct, it has.

9              MS. CASSIDY:  Now it has; but when they first filed

10   it in '09, it wasn't.

11             THE COURT:  Because they were at that one tier.  Now

12   they've gotten to another tier, as I understand.

13             MS. CASSIDY:  There we go again; and so suddenly two

14   years later:  Oh, shoot, we now would like to add two more

15   policies.  And so instead of even attempting to bring them

16   into their own coverage case with their own excess coverage

17   before you, they bring them into a unrelated case that

18   concerns AMPCO and —

19             THE COURT:  We're talking about — I want to focus

20   on the '09.

21             MS. CASSIDY:  I'm focused on that because our

22   perspective in filing this motion in 2009 is directly related

23   to the course of conduct that we started to see emerge where

24   every so often additional policies would be added to the

25   dispute or into a separate dispute and my client would once

1  again be forced to come back in a new piece of litigation and

2  handle additional policies.

3          We learned at or around the time we filed our motion

4  that Faraday had also sought to add additional policies in the

5  excess program not at issue in the '09 action before you, in

6  England.  And my client, New Hampshire, participated in all

7  three of those policies.  And you've heard a lot of discussion

8  about those already.

9          THE COURT:  Those are the '99 and beyond.

10          MS. CASSIDY:  No, the first Faraday policy is the

11  '98.

12          THE COURT:  Right.

13          MS. CASSIDY:  The second two are '99 and 2000, 2001;

14  and those two policies have the mandatory UK provisions.

15          THE COURT:  And these are not — there's no claims,

16  so you can rest easy on those.

17          MS. CASSIDY:  That's correct, and we know that now.

18  At the time we filed our motion before you, two years into the

19  discovery process, it was because of this — this course of

20  conduct by Howden —

21          THE COURT:  But you would have known when they sued

22  you then that you had these other policies.  Why weren't you

23  raising it at that time?

24          MS. CASSIDY:  Because their pleadings were clear

25  that those were the policies that were at issue and the only

1   ones that were going to be implicated.  As time went on and

2   because —

3          THE COURT:  So it's just not —

4          MS. CASSIDY:  And the practical result of this

5   conduct, Your Honor, was that we were before you in the '09

6   action.  Three of our policies are now implicated in the

7   Faraday action.  As a response to that, Howden put two of the

8   policies into the AMPCO action, and at that point by no choice

9   of my clients we were now involved in three pieces of

10  litigation to try to capture and resolve the Howden excess

11  program.

12         THE COURT:  Don't you think the '11 issue is because

13  the follow form belongs in the '09 case?

14         MS. CASSIDY:  Not necessarily, Your Honor.  In light

15  of the fact that the Faraday —

16         THE COURT:  If it's a follow form and we're going to

17  be making decisions about the form in the '09 case, why don't

18  they just come on over to the '011 case?  I mean isn't that

19  going to be dispositive of those?

20         MR. GREANEY:  We would be happy to move to

21  consolidate or do exactly what you said.  Our objective is to

22  get everything —

23         THE COURT:  The issue — I want to finish up the

24  '09, and I'm worry about the timing here, the delays that have

25  already taken place, and, you know — you didn't respond to

1  those issues either.  Did you?

2         MS. CASSIDY:  If I may, Your Honor, I just want to

3  be clear with the Court that this wasn't a tactical maneuver.

4  We were before you for two years.  We actively participated in

5  the discovery process and did not have the intention of filing

6  such a motion.  We didn't at the beginning.

7         We did so now not because we wanted to revisit the

8  traditional forum motion that was before you years ago.  It

9  was because circumstances have changed dramatically and we're

10 now faced with litigation in England and two case before

11 you —

12        THE COURT:  No, you're not.  You're faced with

13 litigation in England because you want to be; you filed the

14 suit over there.

15        MS. CASSIDY:  Only the last suit.

16        THE COURT:  You're the one that chose to go over

17 there.  You could be here happily.  Buffalo didn't sue in

18 England.

19        MS. CASSIDY:  If I would be happily, I would be

20 happily in the 2009 action, happily not in the 2011 case.

21        THE COURT:  And you want to bring everything over to

22 England after everything has gone on here, and it's quite

23 apparent to the Court that's because there's a perceived

24 advantage because of the law over there.  And I don't know, it

25 may be just too late — at least for the '09.

1        MS. CASSIDY:  Our motion —

2        THE COURT:  I don't — I mean it just is something

3   that is very problematic to this Court.

4        MS. CASSIDY:  At the time the motion was filed, it

5   was an attempt to consolidate all of the excess policies that

6   could ever be at issue, whether or not Howden would put them

7   at issue now or two years from now, in order that my client

8   can resolve in one action all of the policies at the same time

9   and then go home.

10        THE COURT:  We can do that here, too, though because

11   they have the — and your case was filed after you were

12   brought into the '11 case here.  I mean it's not — I mean the

13   Faraday situation is a little different, you know, than your

14   situation as New Hampshire.

15        MS. CASSIDY:  And my motion was filed after they

16   brought the additional two policies into the 2011 action

17   because at that point I was now involved in three actions, and

18   when would there be four, when would there be five?  We had to

19   figure out a way to stop this type of litigation.

20        THE COURT:  You could have come here; you made a

21   deliberate choice to go over there.

22        MS. CASSIDY:  The deliberate thought was not out of

23   disrespect to this Court.  It was because two of the policies

24   in the New Hampshire program mandated that they be litigated

25   in England, and so —

1          THE COURT:  I already heard they will not be

2    pursuing it.  I think they told you that beforehand; am I

3    mistaken?

4          MR. GREANEY:  Not mistaken at all, Your Honor; and

5    it's a little bit disingenuous to be hearing that because if

6    they really had an issue as to these post '99 policies, they

7    could have picked up the phone and asked us or they could have

8    brought them in here.

9          You see, we're not permitted to bring them in here

10   without their consent — XL of course agreed several years

11   ago — but they could have done it.  So — and the other point

12   I wanted to make is not only can their rights and obligations

13   be determined comprehensively in the proceedings before this

14   Court, so can everyone else's because you've got 41 policies

15   and 33 insurers before you who are going to have inter-insurer

16   allocation and apportionment disputes.

17         Not only are AMPCO's rights to coverage on the table

18   and Howden's rights to coverage on the table, but insurers'

19   rights to apportionment.

20         THE COURT:  And that's even if we're only focusing

21   on the policies that Howden Buffalo got in its own right

22   after — in the '90s.

23         MR. GREANEY:  I don't think it's possible to just

24   focus on the policies.

25         THE COURT:  That's what I'm saying.  From what I'm

1    hearing today, there's still some kind of overlap even from

2    the '80 policies that they need to find out about these '90

3    policies.

4            MR. GREANEY:  You heard it from Mr. Calogero.  It's

5    clear that these insurers always have inter-allocation

6    apportionment disputes among one another in asbestos and other

7    long tail tort claims because they trigger many years' worth

8    of policies.

9            MS. CASSIDY:  Your Honor, that's not true.  First of

10   all, to respond, Howden is the Plaintiff.  To the extent they

11   seek coverage under policies, I assume that they would bring

12   them in their action.  They didn't at the onset and you

13   know — I've explained to you the reasons why we ultimately

14   had to file the motion based on forum to seek relief.

15           Turning to the fact that these two programs are

16   integrated and somehow everyone needs to be at the same table

17   is not true.  In order to analyze these issues, you have to

18   keep the programs as separate and distinct as they are.  The

19   United Kingdom issued an insurance program to Howden.

20           THE COURT:  The United Kingdom?

21           MS. CASSIDY:  We call it the UK program in the lingo

22   of the case.

23           THE COURT:  It's not the United Kingdom.

24           MS. CASSIDY:  It's a term of art we use in the

25   documents we exchange; I apologize.

1              THE COURT:  Okay.

2              MS. CASSIDY:  That policy — that set of policies

3     was issued from 1995 to 2002 to Howden's parent in England.

4              THE COURT:  In Scotland.

5              MS. CASSIDY:  In the 2009 action Howden seeks relief

6     from the carriers in its own program, its UK program, for the

7     underlying asbestos claims at issue.  Separately AMPCO filed

8     litigation against its own carriers and its own coverage

9     program.  AMPCO is a separate company, and they too face

10    asbestos liabilities.  So the 2011 case before you will

11    resolve those issues on the AMPCO insurance program for AMPCO

12    claims.

13             They're completely unrelated.  The only reason there

14    is overlap is because Howden believes that in addition to its

15    own policies in the UK program, it is also entitled to obtain

16    coverage from the AMPCO program.  And so there are —

17             THE COURT:  Isn't that in part because you have some

18    people who are suffering from asbestosis that — they're

19    suffering throughout all those periods or manifesting later?

20             MR. GREANEY:  The vast majority of claimants,

21    Your Honor — yes.

22             THE COURT:  Yes, go ahead.

23             MR. GREANEY:  The vast majority of asbestos

24    claimants were exposed to asbestos in the 1950s and 1960s,

25    right back here.  By the 1970s, OSHA was coming in and

 1   restricting asbestos in the workplace.  You've got these

 2   workers; they're all Americans, American tort claimants who

 3   inhaled billions and billions of fibers of asbestos in their

 4   lungs in the '50s, '60s and '70s.  The stuff stays in their

 5   lungs, causes — read the J. France opinion; it's all in there

 6   from the Pennsylvania Supreme Court.  It causes an immediate

 7   inflammatory response.  It causes over time the development of

 8   fibrosis.  It causes genetic mutations.  It interferes with

 9   cellular growth and ultimately it leads to tumors and

10   asbestosis, you know, now, 2010, 2011.

11            Because all these policies are occurrence policies,

12   they provide identical occurrence coverage.  They are

13   triggered by injury during the policy period.  The latent

14   injurious process that is going on in somebody's lungs when

15   fibrosis is developing, according to the multiple trigger law

16   in virtually every United States jurisdiction, is injury.

17            The reason that you can't segregate out these

18   identical occurrence policies is that they all insure Howden;

19   they're all our policies.  It doesn't matter who bought them

20   originally — and, by the way, Howden Group Limited is no

21   longer our parent.  So let me just clarify that.  Neither is

22   AMPCO.

23            It doesn't matter who bought them.  They're all our

24   policies.  We're insureds under all these policies.  They all

25   provide the same occurrence coverage.  They are all triggered

1   by these latent disease claims that progressively develop over

2   time.  That's why they can't be segregated out and pulled

3   apart and treated like they're separate programs, because

4   they're not.

5          And so when we — when we filed our complaint and

6   we — in the 2009 and '11 action, we alleged that the AMPCO

7   insurers and these insurers are jointly and severally liable

8   for progressive indivisible asbestos losses.  It's a single

9   claim for relief against all of the insurers under all of

10  these policies.  It's not a separate and unrelated and

11  independent set of claims against each subscribing insurer.

12  How can we possibly do that given the nature of these disease

13  claims?

14         And so we're essentially alleging a joint liability

15  on the part of all these insurers under all these triggered

16  policies for all of the underlying asbestos claims.  That's

17  not a severable and independent count against each insurance

18  company.  It's one count against all of them.

19         And the Third Circuit said in the Chemical Lehman

20  case when — although that's a joinder case — said when you

21  have several insurers alleging a joint — that are alleged to

22  be jointly liable for a single underlying loss, they ought to

23  be in the same action.  So that's our reasoning.

24         MS. CASSIDY:  Your Honor, respectfully,

25  Mr. Greaney's response presumes that he filed in one a choice

1    of law motion, in this case, and that English law was not

2    applied because the result would not be the same.   In

3    addition, however, Howden's claims against its own UK program

4    can be resolved separately.

5           If it would additionally like to make claims on

6    AMPCO policies because they believe they also have rights

7    under AMPCO policies, they can work that out with AMPCO.   And

8    if the AMPCO insurers believe that it is possible that Howden

9    has rights under the policies but that perhaps Howden's own

10   coverage might go first, a priority issue along the lines

11   Mr. Calogero was inferring, well, they can certainly request

12   the production of Howden's policies in the UK program to them

13   in the AMPCO action and they can look at the issue, look at

14   the policies; but they don't need us here for that because

15   this is an entirely separate line of coverage that Howden

16   would like to tap for these claims.   And the two programs are

17   separate and they must be kept separate for this analysis.

18          THE COURT:   What I'm going to do is I'll give my

19   ruling on the '09 policy; then we're going to take a break for

20   lunch and come back and take up the '11 policy at — the

21   motions that have been filed in the 2011 case.   And I will be

22   writing an opinion on this because I think it's important also

23   for the English court to understand the Court's decision.

24          This is very familiar because the Court already had

25   addressed in the — with respect to the prior motion filed by

1   Gerling in the '09 case, what the applicable standards were in
2   deciding a motion for forum non conveniens.  In Windt v. Qwest
3   Communications International, Inc., 529 F.3d 183,
4   Third Circuit, 2008, the Court of Appeals for the
5   Third Circuit reviewed the appropriate framework to determine
6   whether a dismissal pursuant to a forum non conveniens is
7   proper.

8          And when — the Court noted that when considering a
9   motion to dismiss on forum non conveniens grounds, a
10  District Court must first determine whether an adequate
11  alternative forum can entertain the case.  If such a forum
12  exists, the District Court must then determine the appropriate
13  amount of deference to be given to the Plaintiff's choice of
14  forum.

15         Once the District Court has determined the amount of
16  deference due the Plaintiff's choice of forum, the
17  District Court must balance the relevant public and private
18  interest factors.  If the balance of these factors indicates
19  that the trial in the chosen forum would result in oppression
20  or vexation to the Defendant out of all proportion to the
21  Plaintiff's convenience, the District Court may in its
22  discretion dismiss the case on forum non conveniens grounds.

23         And, quite frankly, I think the issues particularly
24  with respect to the private and public interest, given the
25  status of the '09 case, have shifted in favor of the

1   Plaintiff's choice of forum because there has been a great

2   deal of effort already expended in the discovery and the pace

3   of the case is getting ripe for resolution.

4           And again like in the prior -- at the prior hearing,

5   I don't -- you know, I'm going to just assume that the British

6   court is an appropriate forum.  I mean they've already taken

7   jurisdiction over one of the 1998 policies that is not

8   implicated in the '09 case directly at this stage.

9           But what the Court has to look at in terms of the

10  private interests are the relative ease of access to sources

11  of proof, availability of compulsory process for attendance of

12  unwilling witnesses, the cost of obtaining attendance of

13  willing witnesses, the possibility of a view of premises, if

14  view would be appropriate to the action, and all other

15  practical problems that make trial of a case easy, expeditious

16  and inexpensive.

17          So I think if you're looking at the private

18  interests, you know, you're going to be focusing at the end on

19  what's easy, expeditious and inexpensive.  A great deal of

20  expense and time has already gone into the '09 case to get it

21  ready for resolution.  This is going to be the easiest and

22  most expeditious way to resolve this case, particularly for

23  the Plaintiffs, when you consider the Plaintiff's convenience.

24          And the public interest factors look at

25  administrative difficulties flowing from court congestion --

1    that is not implicated here —— the local interest in having

2    localized controversies decided at home, the interest in

3    having a trial of a diversity case in a forum that is at home

4    with the state law that must govern the case, the avoidance of

5    unnecessary problems in conflicts of law or in the application

6    of foreign law, and the unfairness of burdening citizens in an

7    unrelated forum with jury duty.

8         And when I look at that, you know, the conflicts of

9    law, the British forum has spoken on what law they think would

10   be applied at least with respect to Faraday.  But this Court

11   has not had a chance to make that determination.  And it may

12   well be that the foreign law does not apply, that the law that

13   would be applicable would be the law of Pennsylvania —— of

14   Pennsylvania.  And if that is the case, there is —— it would

15   be inappropriate to dispose of this case at this time, and it

16   would be particularly unfair to the Plaintiff who chose the

17   forum.

18        And the Court has already decided a forum non

19   conveniens motion previously adversely to one of the

20   Defendants.  The other Defendant never raised it until this

21   very late time in the case; and so I see this problem in the

22   conflicts of laws at least with respect to Gerling and HDI as

23   one of their own making.

24        You know, you're here on this matter, but you've been

25   here for two-and-a-half years.  The case has proceeded apace

1    and we're getting ready for the case to be resolved.  And now

2    because you've chosen to file a case in England -- you know,

3    that was your choice and you filed it even after the '11 case

4    was included, the policies that you're most concerned with.

5         So what I have to balance is all of those interests.

6    Given the forum here, the discovery being substantially

7    completed at this stage, I just can't see that it would be

8    appropriate under all of those circumstances for the Court to

9    dismiss this action or even to stay it, quite frankly, because

10   I think it's appropriate to move forward, to have this

11   resolved; and this is the -- the case has been pending for

12   two-and-a-half years, and it is time to move on and get this

13   to a resolution.

14        So that would be my ruling with respect to the

15   outstanding motions in the '09 case, and I'll be writing a

16   more robust opinion to address the matters that I've already

17   put on the record.

18        So we'll take our recess now, and we'll be back here at

19   one o'clock to talk about the '11 case.

20             (Whereupon, at 12:00 noon, the luncheon recess was

21   taken.)

22             (In open court.)

23             THE COURT:  Please be seated.

24             Now we're moving on to the motions that have been

25   filed in the 2011 case.  These motions are at ECF No. 265, and

1   it was filed by Faraday Reinsurance Company; 266, filed by

2   General Star International Indemnity, Limited; 269, motion to

3   dismiss by Ace Insurance and HDI-Gerling; and 273, motion to

4   dismiss by New Hampshire Insurance.  So those are the motions

5   that the Court will be addressing here.

6          And at this stage I think it would be appropriate to

7   take up the Faraday and General Star International Indemnity

8   motions.

9          MR. DONLEY:  Miss Snider will handle the argument

10  with your permission.

11         THE COURT:  Thank you.

12         MS. SNIDER:  May I approach the podium?

13         THE COURT:  We've already had quite a bit of

14  discussion, and we'll have some overlap into this.

15         MS. SNIDER:  I think we will and I will try not to

16  go over ground already covered.

17         General Star raised a ground that is only pertinent

18  to it which has to do with the fact that its liabilities and

19  assets have been transferred to Faraday Reinsurance Company.

20         THE COURT:  And that's really a question, I think,

21  for this Court in terms of whether I should recognize that.

22  And the objection by Howden Buffalo has been that this is

23  something that's not binding on this Court.  So -- why

24  shouldn't the Court give deference to that?

25         MR. GREANEY:  You're asking --

1          THE COURT:  Yes.

2          MR. GREANEY:  Well, because the procedure under

3    which that transfer took place is called a Part 7 procedure.

4    It's a general restructural statute in the United Kingdom.

5    And that — it's used inside and outside the insurance context

6    for a variety of corporate reorganizations.

7          But the standard way in which insurance companies

8    who sort of shuffle the deck and move assets around get

9    recognition at the federal level is under Chapter 15 of the US

10   Bankruptcy Code; and they tried that before in a Chapter 7 —

11   not Faraday, but another insurer in a Chapter 7 case.

12         And the US Bankruptcy Court for the Southern

13   District of New York, which is what court usually handles all

14   these, denied it and said recognition is inappropriate under

15   federal law because it's inconsistent with the purposes and

16   objectives of the Bankruptcy Code to recognize a

17   reorganization that doesn't have to do with insolvency.

18         And so they haven't even tried to go through the

19   proscribed route at the federal level to get recognition of

20   this.  And since they haven't filed a routine chapter

21   application, then you say:  Well, should I recognize it as a

22   matter of state law?  And the relevant state laws here would

23   be South Carolina where Howden is based, Delaware where it's

24   incorporated, and Pennsylvania where we are in this case.

25         All three of those states have a very firm rule that

1  a unilateral novation of contractual obligations from

2  Insurer A to Insurer B is not valid --

3          THE COURT:  Is this a novation even though it's done

4  by authority of court?

5          MR. GREANEY:  It's a -- in the US it's a statutorily

6  mandated or approved -- not mandated, a statutorily approved

7  novation.  We received no notice of it, we received no

8  consideration for it, and we did not consent to it.  We did

9  not consent for Faraday to substitute itself as our insurance

10  company.  We have rights under our contracts with General

11  Star.  They're the ones who subscribed to the ten percent

12  piece of that high level excess policy, not Faraday.

13          Now, eventually I can see that we're going to have

14  to make a choice because we've got them both in here.  The

15  reason we have them both in here is that we don't know who's

16  on first.  We don't know anything about this.  It's something

17  that happened over in England.  It's a transaction that we

18  don't know anything about.  We don't know --

19          THE COURT:  They're saying that General Star doesn't

20  have any assets any longer, so there would be sort of like a

21  Pyrrhic victory if you were to get a recovery against them.

22          MR. GREANEY:  Two answers to that, Your Honor.

23  Number one, I would like some discovery to find out if that's

24  true because both General Star and Faraday are owned by the

25  guy in Omaha, Nebraska, that has a lot of money that at the

1    annual meeting kind of strums on the banjo.  I'd like to get

2    discovery to find out who's got the assets, you know, which I

3    can get pretty quickly in this action.

4            And, secondly — I forgot what my second point

5    was — I don't remember what my second point was, but

6    basically I'd like to get some discovery to find out who's got

7    assets before I substitute Faraday for General Star.

8            THE COURT:  It is my understanding Faraday would be

9    acknowledging that it is responsible for all of the

10   liabilities to the extent that they are —

11           MR. GREANEY:  If that's the case, I think that's

12   right; but I think if that's the case, then any judgment we

13   get here against General Star would simply be paid by Faraday

14   because — I mean once under — once that transaction is

15   approved under the UK law, that is just going to happen.  If

16   we get a judgment here against General Star, then Faraday will

17   pay the judgment.

18           MS. SNIDER:  I don't know what would happen if they

19   got a judgment against General Star here once General Star has

20   dissolved, which is what is in the process of happening.  The

21   company is in liquidation.  All of its assets have been

22   transferred pursuant to court order; and among the exhibits we

23   attached were the financial statement which showed that all of

24   those assets that had belonged to General Star are now with

25   Faraday.

1              We simply don't understand the point of proceeding

2      against both here where in England they did not make any

3      argument that a necessary party to the English litigation was

4      missing.  So for some purposes they apparently recognize the

5      English Part 7 transfer that was sanctioned by the court

6      there, and for other purposes here they're saying they need

7      both of us -- both of my clients in the action; and we just

8      don't think it's efficient or necessary.

9              As to the bankruptcy proceeding, in those instances

10     companies were trying to enforce nationwide Part 7 transfers

11     against a multitude of different policy holders.  That is not

12     the case here.  There are not a multitude of US policy holders

13     for which General Star wrote policies where the company felt

14     any need to go into federal court to have the Part 7 transfer

15     recognized.

16             There has -- there have been Part 7 transfers

17     recognized in the US.  The Sphere Drake Part 7 transfer was

18     recognized by the Bankruptcy Court in the Southern District of

19     New York.  So it's not as if they're never recognized.

20             MR. GREANEY:  Can I respond to that?

21             THE COURT:  Okay.

22             MR. GREANEY:  The Sphere Drake is an unpublished,

23     unopposed order which the Southern District Bankruptcy Court

24     enters all the time.  It's not a contested proceeding.  The

25     Rose case we rely on is a contested proceedings and a

1    published opinion of the Southern District Bankruptcy Court.

2         The law is we are not required to accept some

3    barebones balance sheet as a justification for substituting

4    our insurance company for somebody else under the law of some

5    other country.  We're entitled at a minimum, I think, to some

6    discovery before we have to make a choice here.

7         If, in fact, Miss Snider is right and discovery

8    reveals that General Star has absolutely no assets and is

9    going to be wound up and liquidated in the matter of a couple

10   of months, well then obviously that is going to be of some,

11   you know, interest to us in determining, you know, who's on

12   first and who we should go after; but we don't know that yet.

13        THE COURT:  Okay.

14        MS. SNIDER:  The second issue that General Star and

15   Faraday raised was whether or not joinder in this case was

16   improper.  This case was brought initially by AMPCO-Pittsburgh

17   and Air & Liquid against their insurers and --

18        THE COURT:  My preliminary assessment would be that

19   the underlying dispute has to do with AMPCO and Howden Buffalo

20   over policies from the years 1981 through 1985 and in terms of

21   who would have coverage under those policies, and then there's

22   suits against various insurers, and that these additional

23   Defendants that are at issue here were sued under a 1988

24   policy that was issued, you know -- in which AMPCO-Pittsburgh

25   can have no claim because it postdates the transaction.

1          Now, we heard a lot earlier today about how those

2     earlier policies could be impacted by this availability, but

3     it strikes the Court that with the 2009 case we're looking at

4     the same underlying policy as far as follow form

5     circumstances.

6          I guess my question is why in this case and why not

7     in the '09 case or why not a totally separate case?

8          MR. GREANEY:  You want us to address — I mean I can

9     address the factual part of your question, and Mr. Greszler

10    knows a lot more about joinder rules than I do.

11         THE COURT:  Okay.  My understanding is under Rule 21

12    I can sever these claims; I could sever these claims against

13    these additional Defendants, and then it can proceed

14    separately, have its own separate judgment and just move on

15    from there.

16         MR. GREANEY:  Sever them, but not on the forum non

17    conveniens.

18         THE COURT:  Right.

19         MR. GREANEY:  By definition it's a permissive

20    joinder, so it's discretionary; but can I answer the — can I

21    answer the fact part?

22         THE COURT:  About why it's not in the '09 case and

23    in this case?

24         MR. GREANEY:  Yes.

25         THE COURT:  Yes, I would like to know the answer to

1  that.  Yes, sir.

2         MR. GREANEY:  I don't want to try to, you know, take

3  up too much time on this, but let me back up for a minute

4  because this also links up with Miss Cassidy's complaints

5  earlier —

6         THE COURT:  Can you reduce that to an eight by ten

7  and have it also in color, your chart?

8         MR. GREANEY:  Absolutely.  I can actually — if you

9  want a bigger one, I can do that.

10         THE COURT:  I just think it's helpful to see the

11  different colors.

12         MR. GREANEY:  It's just when you get down to eight

13  by ten, it gets —

14         THE COURT:  Too small?

15         MR. GREANEY:  — small, —

16         THE COURT:  Yes, sir.

17         MR. GREANEY:  — tough.

18         THE COURT:  We'll use our discretion maybe.  Okay.

19         MR. GREANEY:  Your Honor, this gets to

20  Miss Cassidy's question as well about why — you know, she

21  said, well, you should have sued everybody all at once.  And,

22  you know, here's the problem.  Most businesses like to engage

23  in productive business.  They don't like to hire lawyers and

24  wage World War III insurance wars for that reason.

25         If we head back to 2003, sued everybody here, there

1   would have been a hue and cry like you wouldn't believe from

2   these high level excess carriers to the effect that we're not

3   in play, it's total speculation, this is non-justiciable,

4   you're never going to reach us.  So that's one reason we

5   didn't sue them.  We sued the first two layers of coverage, as

6   did AMPCO.  We did that because we thought that would be

7   enough.

8          Was it wishful thinking, in hindsight?  Yeah, it

9   was.  But it was a good faith determination that this would do

10  it.  Howden is not clear of when -- about when the asbestos

11  tort liability system -- and it is certainly not clairvoyant

12  about AMPCO's tort liability profile.  The vast majority of

13  the erosion that you see on this chart with these cross

14  hatches is AMPCO claim payments -- not over here, but over

15  here -- because AMPCO owns a pump manufacturer that has become

16  a huge target of the asbestos Plaintiff's bar.

17         We didn't know that in 2003.  We didn't know it in

18  2009 when we started to sue these higher layer carriers to try

19  to fill in gaps that had been created by the erosion of these

20  policies.

21         Fast forward to 2011.  AMPCO hauls off and sues all

22  of its upper level insurance carriers in March.  That was a

23  wake-up call to Howden because we had seen in the loss runs

24  from Utica an escalating rate of erosion of these policies and

25  it concerned us; but we thought, you know, it's a couple bad

1  jury verdicts, things like that.  When they brought in all of

2  their high level excess carriers, that sent a loud and clear

3  message to Howden that they were anticipating that this

4  accelerated rate of claim payments by them was going to

5  continue for a long time.

6         At that point Howden made two decisions.  The first

7  decision it made was to — when AMPCO sued was to post claims

8  against the same insurers because we have rights under the

9  same policy.  We said:  Geez, if AMPCO is saying that all this

10 is going to be in play, they must know something, so we better

11 get our claims in.

12        The second decision we made was to get everybody in

13 HNA, not only part of the program into the same mix, because

14 we said if this is going to erode that quickly because of

15 AMPCO claim payments, we're going to need all of these

16 policies as well.  So that's why we made the decision.

17        Before we could get these guys in, Faraday launched

18 its piecemeal action in England, trying to get a quick and

19 dirty ruling that English law applies; and then we responded

20 immediately and brought everybody into the case.

21        What I'm trying to say is —

22        THE COURT:  Why didn't you bring them into the '09

23 case?

24        MR. GREANEY:  Good question.  The reason that we

25 didn't, Your Honor, is that we thought you'd get mad at us

1   because we were towards the end of discovery and the case was

2   much further advanced.  We weren't concerned about whether

3   they were in the '09 or the '11 case.  We were concerned about

4   getting them in comprehensively before the same judge in the

5   same court so that you could uniformly interpret and apply the

6   policies.  And we knew that because these policies are not

7   really policies, they're just follow form slips, that whenever

8   you interpreted these low level policies to mean --

9          THE COURT:  Those are the '09 case policies.

10         MR. GREANEY:  Right -- would be binding up the chain

11   automatically.  So our reasoning was whether they were in the

12   '11 case or the '09 case really didn't matter because in

13   either event you were ultimately going to construe these low

14   level lead policies; and under basic follow form jurisprudence

15   in the United States, that was going to be binding on these

16   carriers all the way up the chain because that's the program

17   they signed onto.  That's the nature of the risk that they

18   took on.

19         They didn't write their own policies with their own

20   language.  They signed on for the ride to what these insurers

21   wrote, and specifically XL.  So it didn't -- it seemed to us

22   at the time that it didn't matter which roof it was under, you

23   know, whether it was this side of the room or this side of the

24   room, as long as it was before Your Honor.

25         What we were looking for was consistency and

1    uniformity of declaratory relief across all layers of our

2    coverage.  And we weren't — you know, we weren't playing

3    games or trying to, you know, game the system or anything like

4    that.

5              We don't care if the two cases are consolidated.  I

6    mean however you want to do it, we just want it done

7    consistently, you know, across all layers of coverage.  That

8    was our thinking at the time.

9              Does that —

10             THE COURT:  How much discovery would be needed for

11   this additional — these additional claims?

12             MR. GREANEY:  In my opinion, virtually none because

13   by definition these high level subscribers, they don't have an

14   independent existence from the lead underwriter down below.

15   They don't even have their own policy, so in my opinion there

16   would be virtually no need for discovery.

17             MS. SNIDER:  Your Honor, I think that's a completely

18   wrong statement of the law.  Although the Faraday policies

19   contain following form language, that language needs to be

20   interpreted under the law applicable to those particular

21   policies.

22             THE COURT:  You're talking about the policies that

23   are at issue in the '09 litigation?

24             MS. SNIDER:  I'm saying the Faraday policies —

25             THE COURT:  Maybe I'm a little confused here.  Is

1  there really like a separate policy with everything written

2  out or is it just the slip they turn in to say I'm signing up

3  for X amount of excess exposure?

4        MS. SNIDER:  The slip is a separate policy.  It

5  contains within it "underlying wording as applicable."  The

6  interpretation of that underlying wording has to take place

7  within the context of the particular policy at issue.

8        For example, Faraday only signed onto three

9  policies, '98, '99 and 2000.  The '99 and 2000 policies

10  contain that same language, "underlying wording as

11  applicable," and they contain an explicit provision for

12  English law; and so the wording has to be interpreted under

13  English law.

14        We submit that the 1998 policy is also governed by

15  English law, and therefore the wording that's applicable to

16  that policy would be interpreted under English law.

17        MR. GREANEY:  Your Honor, do you want to see

18  actually —

19        THE COURT:  Yes, if you have it handy.  I know I

20  probably have it here, but it's too hard to find with so many

21  pieces of paper.

22        MR. GREANEY:  You'll note that those are just slips.

23  You'll note the absence of any insuring agreement, the absence

24  of any conditions, the absence of any exclusions.  All that

25  policy wording is down below and negotiated by the lead

1  underwriter, XL.

2          MS. SNIDER:  And incorporated by reference into the

3  policy.  Faraday's not a party to the underlying policy; it

4  only insures its policy.

5          MR. GREANEY:  Its ten percent share of the policy.

6          THE COURT:  Can you just walk me through this?  Just

7  take a moment.  On the first page it lists -- in handwriting

8  it lists the policy number; is this the -- this is not the

9  underlying policy number, this is the --

10         MR. GREANEY:  Correct.

11         THE COURT:  Okay.  And then you have the insured,

12  and it's the risk, and then you have another page; but it says

13  it's Page 1 of 1.  I mean what is -- what is -- is this

14  something that goes with a cover?  What is this?

15         MR. GREANEY:  Tim, you can correct if I'm wrong.  I

16  think that's a combination of the slips for all the following

17  form subscribers.

18         MR. GRESZLER:  There are a few endorsements to the

19  policy, I think is what they are.

20         MS. SNIDER:  Correct, there is an endorsement as to

21  the exchange rate that will be used in looking at the limit

22  under the policy.

23         THE COURT:  Okay.

24         MS. SNIDER:  There is an endorsement adding the town

25  of Avon as an additional insured.

1              THE COURT:  Okay.

2              MS. SNIDER:  There is an endorsement adding Chicago

3    Bridge Industries as a named insured with respect to

4    particular exposure.  There is an endorsement relating to

5    United Kingdom insurance premium tax.

6              MR. GREANEY:  But those endorsements are in the

7    underlying XL policy, that's the thing.  The wording —— the

8    operative wording picks up by reference the wording of the XL

9    policy.  There's no credible dispute about that.

10             THE COURT:  Where do you see the ten percent or what

11   they're signing up for?

12             MR. GRESZLER:  Right at the last, I think, two pages

13   there's a series of —— they're called stamps, and the top one

14   says Binter Thor, and that's XL applied percent share.

15             THE COURT:  I'm sorry ——

16             MR. GRESZLER:  I think probably the second to the

17   last page ——

18             MS. SNIDER:  The General Star stamp is on the very

19   last page, but the endorsements that we were referring to

20   contain this policy number.  They do not contain the policy

21   number for the underlying policy.  So they're not pages from a

22   different policy that have been inserted into this policy.

23             MR. GREANEY:  I don't think an endorsement adding

24   the town of Avon as an insured has any relevance to what we're

25   talking about in this case.

1          MR. GRESZLER:  To answer your question, Your Honor,

2    the way the London market works, the insured goes out and

3    negotiates with a lead underwriter, who in this case was XL.

4    So if you see —— if you found the page with the stamps, XL is

5    the top stamp.

6          THE COURT:  That's that Binter Thor ——

7          MR. GRESZLER:  Yes, meaning XL is the lead carrier.

8    Then you have a series of stamps from other insurers,

9    New Hampshire, Faraday —— that might be it for this policy, I

10   can't remember.

11         THE COURT:  General Star, ten percent.

12         MR. GRESZLER:  Correct.  So those are following

13   lines, insurers, who basically just signed on for the ride

14   after the wording had been agreed with with Binter Thor in the

15   underlying policy.

16         MS. SNIDER:  I don't think any of the carriers would

17   agree they signed on for the ride.  They signed onto their own

18   policy for their own several liability.

19         THE COURT:  Okay.  And is this number, the

20   LD116981998, a unique number for the General Star ten percent?

21         MS. SNIDER:  Correct.

22         MR. GREANEY:  Actually, I think that's —— that

23   describes this high level hundred million dollar policy, and

24   they signed onto ten percent of it.

25         THE COURT:  The high level number is different from

 1   that lower number.  I just — I'm looking at the stamp and

 2   it's got a series of letters and numbers.

 3          MR. GRESZLER:  That is an internal number that I

 4   think each insurer uses for their policies.

 5          THE COURT:  So I guess the theory that General —

 6   that General Star/Faraday would have is that they are

 7   separate; signing on is a totally separate contract.

 8          MS. SNIDER:  That's correct.

 9          THE COURT:  And it has nothing to do with the

10   contracts that the other additional Defendants entered into

11   with respect to the same excess coverage.

12          MS. SNIDER:  That's correct.

13          THE COURT:  And that's how the British court — or

14   the English court looked at this.

15          MS. SNIDER:  That is how the English court looks at

16   it.

17          THE COURT:  Okay.  And the position of Howden is

18   that that's not the way the American courts view this.

19          MR. GREANEY:  The position of Howden is it's

20   manifestly not the way an American court would look at it.  An

21   American court would look at this as one gigantic policy, led

22   by XL.  And the subscribers further up the ladder, all they

23   say is "wording is underlying," and they incorporate by

24   reference that wording.

25          And as I said this morning, the purpose of this is

1   to reduce the transaction costs to the policy holder in a

2   subscription market of having to go out and negotiate with 20

3   different underwriters.  You can just deal with one instead,

4   over the policy wording.

5          But even more importantly, more critically

6   importantly is to assure that that entire 200 million dollar

7   tower will be uniformly construed to the extent possible layer

8   upon layer.  In other words, it's supposed to accomplish

9   something.

10          So you say what is it supposed to accomplish?  For a

11   policy holder it's supposed to accomplish seamless,

12   catastrophic loss protection all the way up the chain.  And so

13   if each fragment of a subscription way up the chain was

14   construed by different courts applying different laws and

15   different legal rules, the result for the policy holder would

16   be chaos.  It would be incoherence.  And it would inevitably

17   be balkanization, gaps in coverage, and inconsistent results.

18   All of which, you know, is terrible for a policy holder faced

19   with mass tort liability struggling to secure its insurance

20   asset.

21          You can't do it unless it's construed holistically.

22   That's the only way you can get meaningful coverage.

23          Now, maybe we'll win the coverage, maybe we'll lose.

24   But it has to be construed uniformly.  It can't be construed

25   gravitationally, pulled apart at the seams, you know.  Here's

1    a piece, send this to the English judge; here's a piece, send

2    to another English judge.  Here's a couple more pieces, leave

3    it in front of this court.  That is highly detrimental and

4    prejudicial to a policy holder.

5                And I think as the Third Circuit opinion makes

6    clear, although it's a very short reference, the economic

7    purpose in this country of a follow form insurance program is

8    to assure, among other things, that the high level policies

9    are interpreted in the same way as the underlying lead policy.

10               MS. SNIDER:  I just have two points to make with

11   respect to this.  First, this analysis ignores the 1999 and

12   2000 policies which are related and which call for English

13   law.

14               This was a policy placed in England by a English

15   broker with English underwriters.  And what Howden would like

16   is to say the fortuity of where tort losses may occur is what

17   should govern the interpretation of the policy, and that's not

18   the law in England and that's not the law in Pennsylvania.

19               Secondly, I wanted to address —

20               THE COURT:  I think their point is when you have

21   these kind of multi-national insurance programs where you have

22   insurance companies from all over the world, different

23   locations, you've got insureds that are going to be all over

24   the world, so you have just a massive number of contacts; that

25   the typical US approach would be that you look at a variety of

1  factors and it's not -- you're not limited to just looking at

2  where it was negotiated because you have so many places that

3  were looking at this and dealing with these issues.  And

4  therefore you're not going to be -- it's not as simple as you

5  would like it to be and as the British court determined it to

6  be.

7        MS. SNIDER:  It's obviously not simple or I wouldn't

8  be here today.

9        I think their approach, though, is focusing on

10  contacts that don't matter at all to the policy.  Pennsylvania

11  has nothing to do with Howden Buffalo.  The stock purchase

12  agreement with AMPCO calls for their disputes to be litigated

13  here and they're attempting to take advantage of this forum to

14  have the Pennsylvania choice of law when there's absolutely no

15  relationship between Pennsylvania, the insurance policy, and

16  the parties to that policy.

17        And so this comprehensive program is not, in fact,

18  what everyone signed onto.  People signed onto individual

19  policies.  And I think the sanctity of contract is something

20  that is needed to be considered in looking at what parties'

21  obligations are under the contracts they entered into, not

22  under contracts other people entered into.

23        THE COURT:  The problem is when you have this type

24  of program where you have follow form policy, you have to --

25  there's always an underlying policy.  And the point that the

1   Plaintiff is making here is that we have lots of players in

2   the underlying policies and the various levels, but it's all

3   the same kind of policy language and it would be inappropriate

4   to have different courts applying different laws.  And they're

5   already here for the 2000 and 2009 case where they've had it

6   play other policy years with exactly the same language.

7          MS. SNIDER:  And they are here with respect to the

8   2009 litigation, which Faraday was not joined in; and which

9   brings me to the little bit of creative timeline that they

10  used when they were explaining why they didn't add the two

11  1998 policies that are now part of the 2011 litigation to the

12  2009 litigation.

13         Howden provided a precautionary notice of claims to

14  Faraday in August of 2010 under the 1999 and the 2000 policy,

15  subsequently clarified that it meant it was giving

16  precautionary notice of claims under the 1998 policy as well.

17  That was in 2010.

18         In 2011 AMPCO filed this litigation.  I think it was

19  April of 2011 Howden filed its answer.  It did not add any

20  additional policies until after Faraday instituted its action

21  in England.  So somehow between April and June when it asked

22  permission to amend its answer in this case it learned

23  supposedly of the fact that the policies were going to be

24  perhaps implicated.

25         That timing does not make sense to me at all and

1    seems to be contradicted by their answer in April and the fact

2    that they have admitted that they only added the 1998 policies

3    in response to Faraday's action in London.

4         THE COURT:  That's the only thing that really

5    bothers me about the Faraday issue, is that Faraday —— I don't

6    think there's anything wrong with them going to the court in

7    England to seek relief; and that court has —— has started to

8    review the issues that have been raised and have made some

9    preliminary assessments as to applicable law and that type of

10   thing, although I understand there's likely to be or has been

11   an appeal filed.

12        So, you know, that's really a problem and what

13   should this Court do under those circumstances?

14        MR. GREANEY:  Well, I think the law —— first of all,

15   let me just —— the statement that we sent out a precautionary

16   notice letter, I mean Howden like any prudent insured, you

17   know, wanted to keep all of its carriers abreast of the

18   development.  We didn't make a claim of coverage against

19   Faraday in 2010 or any of these excess policies.

20        AMPCO didn't serve us until March with its action.

21   We responded initially by cross-claiming against these other

22   insurers and then promptly thereafter we did try to make the

23   action as comprehensive as possible by bringing in everybody

24   else.  I don't know what's so unusual about that timing.

25        In terms of the English court, you know, they

1    basically responded — the first time in my career an

2    insurance company responded to a precautionary notice letter

3    by hauling off and filing a lawsuit, and then they wait six

4    months before they even serve it, trying to sort of bleed

5    information out of us.

6         The law in this Circuit — and, really, I think in

7    all circuits — is that the pendency of a parallel action in a

8    foreign country does not warrant the federal court from

9    dispensing with its virtually unflagging obligation to

10   exercise jurisdiction over cases that are before it.

11        That principle applies with particular force in a

12   case like this where the action that you have before you is

13   far more comprehensive in scope, far more comprehensive in

14   scope than the little fraction of an action before that

15   English judge which involves a ten percent piece of one high

16   level excess policy out of the 41 policies that you have

17   before you.

18        So what sense would it make under those

19   circumstances to try to sever out and defer — even if the law

20   permitted you to do that — to an English judge on a ten

21   percent fractional share of one little subscription to a

22   policy when the whole rest of the dispute is in front of you?

23        You're going to decide it.  You're going to be in a

24   position to issue clear, consistent, uniform, declaratory

25   relief that comprehensively resolves the rights and

1    obligations of 33 insurers and two policy holders in one

2    uniform action; and that also resolves the apportionment

3    disputes between and among the insurers that have already

4    erupted in response to our and AMPCO's claims in a single

5    action.

6            Remember there's a very strong judicial policy in

7    the United States in favor of inclusive dispute resolution,

8    especially in complex multiyear, multilayer insurance disputes

9    where the policy holder is struggling with very significant

10   and potentially large scale mass tort liability that has

11   driven a lot of them into bankruptcy and is seeking a forum

12   that can — that it can tether all the claims to so that it

13   could get clarity and uniformity of interpretation.

14           We cited the General Reed case from the

15   Second Circuit.  We cited the Foremost McKesson case from the

16   First Circuit.  We cited the Sumy case from the Third Circuit

17   which basically said ordinarily, you know, you ought to

18   resolve these cases under a single roof.  That's US public

19   policy, as is the deference to a Plaintiff's choice of forum

20   and the general unwillingness to allow a US policy holder

21   seeking a comprehensive resolution of its rights and

22   obligations in the US court to even in part be kicked out of

23   the United States court at the behest of foreign insurers and

24   sent packing to a foreign jurisdiction.

25           So the general rule is that the actions proceed

1   concurrently unless and until one becomes res judicata of the

2   other.  And —

3           THE COURT:  So if the English court would make its

4   decision and it becomes final, then that would be res judicata

5   over here?

6           MR. GREANEY:  Not necessarily.

7           THE COURT:  So it will be a race, is that what

8   you're saying?

9           MR. GREANEY:  It will be a race; but keep in mind —

10  here's another point that I should have made and didn't.

11  Faraday's seeking very limited relief compared —

12          THE COURT:  I did note that.

13          MR. GREANEY:  All they're asking for is a preemptive

14  ruling on their English conflicts laws, that English law

15  applies to the policy, because they think that they're not

16  going to get that result under Pennsylvania's more flexible

17  nuance conflict of law approach.  They're not asking the

18  English court to issue all these rulings on coverage issues.

19          Remember that our claims against them in this case

20  raise a whole host of substantive coverage issues, not just

21  choice of law.  You know, trigger allocation, apportionment,

22  are defense costs covered, what's the impact of the asbestos

23  funding agreement on the exhaustion of the underlying

24  coverage, how do you determine whether and when the underlying

25  coverage is exhausted, the reasonableness of our indemnity

1   payments and settlement strategy, the reasonableness of our

2   defense costs, number of occurrences, and on and on.

3          Those issues are all here.  They're not at issue in

4   the Faraday action, and that's an additional reason why it

5   would be in our view respectfully improper for the court to

6   just ice that little fraction of the case or defer to the

7   English court; because while the actions are concurrent,

8   they're not really parallel and identical.  The relief sought

9   is not the same.

10         THE COURT:  Can I just stop you for just one minute?

11  I have to do a detention hearing at two o'clock that's going

12  to last about an hour.  Are you able to return after that or

13  do you have — everybody have flights?

14         MR. GREANEY:  We'll do what you want us to do.

15         MS. SNIDER:  Happy to change my flight.

16         THE COURT:  Is that okay?  If we can finish at least

17  the argument portion of this today, that would eliminate the

18  need to come back at another time.  But I do have to take the

19  detention hearing because the individual is being detained and

20  I need to get that resolved.  Okay?

21         MS. SNIDER:  Your Honor, the only other point I

22  wanted to make about Faraday, that you had said, well, if

23  there's going to be a race to judgment, what's going to

24  happen?  What's going to happen, I think, is revealed by the

25  Third Circuit precedent in cases like RayTech and the Murphy

1    Teva case in the federal court in Delaware.  They're going to

2    come here waving a judgment if they get it first saying you've

3    got to follow what English law applies.

4            But whether that sort of preclusive effect is

5    appropriate under Third Circuit precedent would depend upon

6    whether you determine that the issue litigated in England was

7    substantially the same as the one before you.  And under

8    Third Circuit precedent, an issue is the same only if the

9    legal standard that is applied to resolve the issue is

10   substantially similar.  And the legal standard that the

11   English court is applying is a rather extreme version of lex

12   loci contractus which has been discredited as a choice of law

13   rule in Pennsylvania.

14           The legal standard that applies here is a

15   multifactor flexible balancing of interest test set forth in

16   the Restatement 188, Restatement Section 6, which requires you

17   to weigh a whole bunch of factors against substantive public

18   policies and interests of England and Pennsylvania and the

19   Restatement goals of, you know, predictability and uniformity

20   of result and all those other things to come up with a

21   determination of what law on balance is most intimately

22   connected with the outcome of the dispute.

23           So it's our view that anything the English court

24   does is not going to be issue preclusive.  You will still have

25   to engage in that weighing analysis.  And it may well be that

1    if you decide it on the basis of that weighing analysis, that

2    English law applies under Pennsylvania conflict law.  You

3    could defer to the English court because he may know about

4    English law.  But we don't think it's going to get to that

5    point.  We think the Pennsylvania conflicts analysis is not

6    going to yield English law.

7            THE COURT:  Okay.  We'll be at recess, and I think

8    it's going to be in here before three o'clock because one of

9    the counsel for the Government has to leave at three, so I

10   think I'm really comfortable in saying we'll reconvene as

11   shortly after three as possible.  Okay.

12           (Recess taken.)

13           (In open court; hearing resumed.)

14           THE COURT:  Okay, we were on the Faraday motion at

15   the conclusion, just before the break.  At this time is there

16   anything further that anyone wishes to be heard on with

17   respect to that, the Faraday motion?

18           MS. SNIDER:  I just have a few last points to make.

19           THE COURT:  Okay.

20           MS. SNIDER:  Before we took the break, counsel was

21   discussing choice of law.  And Faraday believes that the

22   choice of law made in the English proceeding will have

23   preclusive effect here, but that it is not necessary for the

24   Court to decide what preclusive effect it would have at this

25   stage of any proceeding.

1              Secondly, with respect to the General Star issue, if

2     Howden is making a claim against General Star on the basis

3     that the Part 7 transfer is not binding on Howden, then there

4     is no basis on which it can make a claim against Faraday under

5     that same Part 7 transfer.

6              And, finally, the Court should interpret each policy

7     according to the terms of that policy and the law that applies

8     to it, whether that law is contained as a choice of law within

9     the policy or the Court decides in the absence of such a

10    choice of law what the applicable law is.

11             So the policy holder who is interested in having a

12    particular law applied to its coverage and throughout an

13    entire series of policies has an option that it can make if it

14    wants certainty, which is to include a choice of law as was

15    done in the '99 and 2000 policies where English law was

16    explicitly chosen.

17             Thank you, Your Honor.

18             MR. GREANEY:  May I say just a couple of quick

19    things?

20             THE COURT:  Okay.

21             MR. GREANEY:  The Court has jurisdiction over this

22    case in its entirety.  The general rule is that the Court has

23    a virtually unflagging obligation — that's Supreme Court

24    words, not mine — obligation to exercise its jurisdiction

25    notwithstanding the pendency of a piecemeal action in another

1    country unless and until one becomes res judicata of the other

2    one, which hasn't happened here.

3            Second, as I said before, the relief sought in the

4    Faraday action is much narrower than the relief that we're

5    seeking here.

6            Third, there's a case, Direct TV, Inc., versus Leto,

7    L-E-T-O, a Third Circuit case, 467 F.3d 842.  That case holds

8    among other things that claims should not be abated or

9    dismissed under Rule 21 if they prejudice any substantial

10   right of the Plaintiff.

11           Our position would be that severing out Faraday here

12   would in fact prejudice a substantial right of Howden by

13   creating the pretty severe potential for an inconsistent

14   judgment and gaps in coverage that we spoke about earlier.

15           And, finally, I wanted to point out that the first

16   in time rule doesn't apply when actions have been filed and

17   served very close in time to one another; and we cited cases

18   in our brief at Page 15, Note 7 that emphasize that.

19           In that situation the focus of the federal court

20   needs to be on which of the two courts can provide the more

21   comprehensive relief; and in our view that isn't a close

22   question here.

23           THE COURT:  Okay.  How long would it take you to do

24   the discovery that you need to make a determination about

25   whether to proceed against Faraday or General Star?

1          MR. GREANEY:  Part would depend upon the degree of

2    cooperation we got.  I mean if we hear these arguments about,

3    you know, non-party witnesses and all that, it might take 60

4    to 90 days.  If we get total cooperation, 30 to 60 days.

5          THE COURT:  Is that going to be a problem with the

6    cooperation?  I mean if it's clear that General Star has no

7    assets and everything is gone, you know, that's the easiest

8    way to resolve that issue.

9          MS. SNIDER:  I understood that the Court was only

10   asking about discovery with respect to General Star's transfer

11   of liability --

12         THE COURT:  Yes, yes.

13         MS. SNIDER:  I would think that could be done very

14   rapidly.  We've attached the financial statements which show

15   the exact amounts of those transfers.  We could discuss with

16   counsel what more they need to see.

17         MR. GREANEY:  We probably would like a 30(b)(6)

18   deposition.

19         THE COURT:  They may not have any officers left to

20   give you one.

21         MR. GREANEY:  I think -- our understanding is that

22   they do.

23         THE COURT:  Okay.

24         MS. SNIDER:  I don't know whether they do or not.  I

25   know liquidators have been appointed.

1              MR. GREANEY:  We'd be happy to take the deposition

2      of a liquidator.  They tend to know a lot.

3              THE COURT:  Okay.

4              Well, this is the most difficult of all the matters

5      that the Court has to deal with today, and that is because

6      Faraday was not involved in the '09 case unlike the other

7      Defendants who raised the issue.  Faraday did bring a case

8      prior to the third party complaint being filed against them in

9      the 2011 case, so — and the decision, although it's not a

10     final decision on the merits, it is a decision that deals with

11     some issues that would be of significance in the resolution of

12     this case, of the two cases that are before the Court.

13             But when I put that aside and I'm persuaded by this

14     concern over the follow form policy and that to the extent

15     that this is a form that is going to be followed, that the

16     policy in issue in the litigation against Faraday and General

17     Star involve the — involve the same policy in terms of the

18     language that is at issue in the 2009 case, it just makes

19     sense to the Court that that issue would be resolved in this

20     court, and so that you can have consistency of decision

21     making, and that it would be economical and efficient because

22     those policies have already been — the policies at issue —

23     the 2009 litigation discovery is already completed with those.

24             So while there may be some follow-up matters that

25     have to be attended to, the bulk of the discovery has been

1  done.  Albeit Faraday and/or General Star will need to have

2  access to all of that, and they may need to retake some to the

3  extent they feel the need to.  So that's not as simple, I

4  think, as Howden Buffalo would portray it here because unlike

5  the other Defendants, this -- these two Defendants were not

6  privy to the litigation and were not participants in the

7  discovery with respect to the 2009 case.

8          But when I look at this overall and being mindful of

9  the concerns for consistent interpretation of the same

10  policies, although it's somewhat more of -- it is a close

11  question for the Court.  I would find that the dismissal is

12  not warranted.

13          On the other hand, I think a severance would be

14  appropriate.  It doesn't have anything to do with

15  AMPCO-Pittsburgh, and the underlying litigation in the 2011

16  case has to do mainly with Howden Buffalo and AMPCO-Pittsburgh

17  who are going to be divvying up the insurance that is at issue

18  for the policies of 1981 through 1985.  And so while there may

19  be some relationship, it's more tangential and it would be

20  more appropriate I think to sever that matter.

21          And now I need to consider whether it should be

22  consolidated with the 2009 case or just proceed separately, so

23  I'll hear from the parties on that.

24          MS. SNIDER:  At this stage of the case I understand

25  that fact discovery is completed in the 2009 litigation,

1   they're in the midst of expert discovery.  We haven't had a

2   chance to review a single document relating to that case, and

3   I haven't had an opportunity to speak with my client about

4   their preferences with respect to how to proceed.  I don't

5   think we would want to be on the same time schedule as the

6   2009 action.

7            THE COURT:  Okay.  So I think it would be more

8   appropriate just to have another case; and if you catch up

9   quickly enough, we can consolidate it and make it more

10  efficient in the one case.  But I think it will have to be

11  severed.

12           MR. GREANEY:  May I make one other comment,

13  Your Honor?

14           THE COURT:  Yes.

15           MR. GREANEY:  Recognizing that these cases have

16  proceeded on somewhat, you know, different time periods,

17  the — there's an inevitability about apportionment disputes

18  that are going to impact the AMPCO/Howden policies and the

19  Howden only policies.  Because —

20           THE COURT:  I think that's another factor that I

21  neglected to mention, that I took into account that there

22  are — there will be a need for discovery, cross discovery

23  that will impact on these various cases.

24           MR. GREANEY:  And perhaps we don't need to decide it

25  today, but a mechanism is going to have to be found —

1          THE COURT:  I think we can jointly administer the

2     cases so you can make it more efficient for all the parties.

3     I don't think that's a particularly difficult thing to

4     accomplish.

5          MR. GREANEY:  Okay, maybe I'm just sort of —

6          THE COURT:  We can have a motion, if everybody wants

7     to consider that, for joining the administration so everybody

8     knows whatever is going on in all the other cases.  Is that

9     helpful?

10          MR. GREANEY:  I think I'm going to talk to AMPCO.

11     We may want to do that because obviously the availability of

12     coverage under the Howden only policy will impact how much

13     coverage AMPCO has at the end of the day under their program.

14     If we don't have coverage, then we're going to go after the

15     same Howden policies, so it all kind of jumbles together.

16          THE COURT:  Well, if you think they should all be

17     consolidated, that's a different issue; but we do have

18     different time tables in the cases and we are pretty well

19     under way with the 2009 case.

20          MR. GREANEY:  I understand.  I'm just raising it as

21     an issue that's out there.

22          MS. CLEMENTS:  Your Honor, as part of the logistics,

23     but the clients I have that are not HDI-Gerling — of course

24     HDI-Gerling is in the 2009 case and has had the opportunity to

25     go through the discovery and take its discovery that it wanted

1  to in that case; but with four other clients, if they're in a

2  severed case and there's a ruling on the '98 policy in the '09

3  case, is it now going to be issue preclusion and they've never

4  had any opportunity to take discovery and be involved in the

5  rulings that will come down on those policies?

6       THE COURT:  The only person that would be precluded

7  from re-litigating it would be Howden Buffalo, you know.  If

8  somebody is not a party to the prior litigation, I don't think

9  they're bound by it.  But if it's adverse to Howden Buffalo,

10  they would reap the benefit of that.

11       MS. CLEMENTS:  We would have some concerns as to the

12  comments that have been made about the follow form policies,

13  that if a lower layer policy has a ruling in the '09 case, it

14  essentially ties the hands and precludes them from making any

15  arguments in the '11 case or what's going to be the newly

16  severed case; whereas if they were together and there was at

17  least an opportunity for a bit of an extension on discovery,

18  they would be up to speed with everyone else and have the same

19  opportunities to be involved with expert discovery and to be

20  able to put in their positions on these policies and how

21  they're going to be interpreted.

22       THE COURT:  I am loath to get the 2009 case really

23  dragged out.  I think it would be sufficient for today's

24  purposes to sever it, and then I'm going to direct everybody

25  to meet and confer; and you are all going to be involved in

1  the mediation because everybody is doing the mediation.

2          That will apply because while it's severed, there's

3  still the mediation agreement that's been entered into and

4  there's still the discovery order that I've entered in that

5  case that will be equally applicable to the severed claims.

6  You know, there's not going to be any difference there.

7          So fact discovery for these -- on the 2011 cases --

8  and I'm not quite sure if I sever it I can still keep them in

9  the same case, and it just would be that they will be tried

10  separately.  I'm a little bit uncertain about that.  I was

11  trying to look at some of the applicable case law and I wasn't

12  getting a definitive answer.  Does anybody have any knowledge

13  on that?

14          MS. CLEMENTS:  I would be willing to submit briefs

15  on that if you would prefer we get it in the form of a motion.

16          THE COURT:  I don't know if we need to create a

17  separate case, but they will definitely be separate, so they

18  will not be tried together; but I don't know if that means

19  it's best to have a totally separate case with its own docket

20  or we can continue apace on the same docket.  But we have --

21  at least have those time frames.

22          So I would suggest that you meet and confer over

23  these issues with respect to the 2009 litigation and what I'll

24  call now the severed claims to see how those should be dealt

25  with in terms of the time frame; and if there's any way to

1   accelerate, then maybe you don't need to go until the end of

2   May.  Maybe you can accomplish that within 60 or 90 days,

3   given everything that's taken place.  But I think you should

4   meet and confer on that and I'll set a conference call date

5   for us to reconvene on that.

6          But now I haven't heard from New Hampshire or

7   HDI-Gerling on their motions that have been filed in the 2011

8   case; but I think the Court's decision with respect to Faraday

9   and General Star matters are -- because that was a closer

10  case, it's less close with the other Defendants because they

11  hadn't filed suit in England until after these claims were

12  filed here.  And whether they were filed in the 2011 case or

13  there had been a filing in the 2009 case, they still came

14  later, so that's a little different.

15         MS. CLEMENTS:  Your Honor, as to -- I believe all of

16  them except for HDI-Gerling, this is what they typically refer

17  to as a first known DJ.  The DJ is the first notice they're

18  getting of these claims.  Now, this puts them in a different

19  position as to when they could have filed, not having gotten

20  notice until they were actually sued here.  So to have that be

21  held against them because they didn't file early, anticipating

22  that there would be claims when they hadn't received a notice,

23  is slightly problematic from their point of view.

24         MR. GREANEY:  The DJ was manifesting not their first

25  notice of a claims.  We have been apprising them through

1   status reports periodically the status of the asbestos

2   litigation, and we served them four months before they served

3   us, so I don't know quite what the point is of Miss Clements's

4   remarks.

5          MS. CLEMENTS:  Your Honor, I've only seen on a

6   distribution list one client named, and they had no other

7   documents that put them on notice of these claims.  And they

8   can only file the English proceedings after they're given

9   notice; and as far as my understanding is, that this DJ was

10   that notice.

11          MR. GRESZLER:  That certainly wasn't true of Faraday

12   which hauled off and sued us in response to a preliminary

13   status report and then kept silent about it for six months; so

14   I don't think that's quite accurate.

15          MS. CLEMENTS:  That certainly has nothing to do with

16   the Portman action, QBE and Swiss Re.

17          THE COURT:  Do you wish to be heard?

18          MS. CASSIDY:  No.

19          THE COURT:  For the same reasons that I've

20   articulated on the report with respect to Faraday and General

21   Star, the Court will deny the motions that have been filed.  I

22   will be entering a written order on this to explain more fully

23   the reasons in addition to what I've already said on the

24   record.

25          So at this stage those motions have been –– have now

1   been dealt with and we need to —— the only other thing that I
2   thought might be helpful to deal with today was this motion to
3   reconsider the order on the motion to seal the document.  And
4   this was filed by HDI—Gerling in the 2009 case, and it had to
5   do with the —— it had to do with the information that was set
6   forth on the record.

7           MS. CLEMENTS:  That motion was filed under seal.  I
8   was not aware it was going to be addressed today and I was not
9   able to get attachments to come through on a PDF.  I have the
10  motion itself, but I don't have the documents; and it also was
11  filed under seal.

12          THE COURT:  Okay.  And maybe we can just set a time
13  to hear that as well.

14          Now, we have the hearing on the sanctions coming up.
15  Maybe we'll do it on that day.

16          MR. GREANEY:  December 20th I think is the day?

17          THE COURT:  Why don't we hear it that day?  I think
18  we'll just do it that way.

19          MS. CLEMENTS:  Excellent.

20          THE COURT:  Now, we need to do a conference call on
21  the issues with respect to whether Howden Buffalo intends to
22  proceed against Faraday and Gerling, and there should be some
23  cooperative discovery so we can do that on an expedited basis;
24  so why don't we set a call for January —— how about January
25  the 18th at 4:30 p.m.?

1              MR. GREANEY:  Fine with Howden, Your Honor.

2              MS. SNIDER:  Fine with us as well.

3              THE COURT:  Okay.  That gives you not quite two

4    months, about — a little more than two months to see what

5    kind of discovery you're able to get and see if you're in a

6    position to make a decision, because — and I would just put

7    on the record I don't think that there had to be a firm

8    decision today, the beginning of the case.  You know, there's

9    pleading in the alternative in our system, and — but at some

10   point there has to be a decision made, and I think the sooner

11   that can be done, the better it will be.

12             I know that I'm not precluded from looking at

13   General Star by the proceeding in England, but on the other

14   hand if it's clear that that's what's going to be happening,

15   it's going to be liquidated, there's no assets as a practical

16   matter, I think it doesn't make any sense to continue to have

17   them in as a party here, if the real party in interest is

18   going to be Faraday, because they have the assets and they're

19   recognized and they're taking those liabilities.

20             So we'll have a status call on that at that time.

21   And then we'll be getting back together on the 20th on the

22   issue of sanctions.

23             Is there anything else to come before the Court

24   today?

25             MR. GREANEY:  No, Your Honor, not for Howden.

1          MS. CLEMENTS:  No.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          (Whereupon, at 3:25 p.m., the hearing was

4   concluded.)

5                    *  *  *  *  *

6                C E R T I F I C A T E

7          I, Shirley Ann Hall, certify that the foregoing is a

8   correct transcript for the record of proceedings in the

9   above-titled matter.

10

11

12                              s/Shirley Ann Hall
                                Shirley Ann Hall, RDR, CRR
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25